[Crim. No. 1268.  In Bank.—January 8, 1906.]

## THE PEOPLE, Respondent, v. JOHN McCLURE, Appellant.

CRIMINAL LAW — MURDER — SHOOTING OF ANOTHER PERSON — PART OF SAME TRANSACTION.—Where a defendant accused of the murder of one person also shot and killed another person first, as part of the same transaction and from the same motive, so that there could not well be an intelligent statement of the one murder which did not allude to the other, the court did not err in allowing evidence that the defendant shot and killed such other person in addition to killing the one he was accused of murdering.

ID.—INSTRUCTIONS—BURDEN OF PROOF.—In view of the evidence in the case the court properly instructed the jury as to the rule embodied in section 1105 of the Penal Code respecting the burden of proof resting upon the defendant, where the commission of the homicide is proved, to show circumstances in mitigation, justification, or excuse, etc.

ID.—INSTRUCTION AS TO REASONABLE DOUBT OF KILLING OTHER PERSON. —An instruction that the only relation or object in considering the testimony as to the shooting of the other person was to illustrate or establish the intent or motive with which the homicide charged was done, and that before the jury could consider such shooting they must be satisfied beyond a reasonable doubt that defendant shot such other person wilfully, unlawfully, and intentionally, otherwise the testimony on that question should be disregarded, could not be prejudicial to the appellant.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. B. N. Smith, Judge.

The facts are stated in the opinion of the court.

W. F. McLaughlin, for Appellant.

U. S. Webb, Attorney-General, and C. N. Post, Assistant Attorney-General, for Respondent.

McFARLAND, J.—Defendant was charged with the murder of one Jerry O'Shea, and the jury found him guilty of murder in the first degree and imposed the death penalty. He appeals from the judgment and from an order denying his motion for a new trial.

There is no foundation for the contention that there was not sufficient evidence to justify the verdict of murder in the first degree; and the only point which calls for special notice arises out of the contention that the court erred in allowing evidence that appellant, in addition to killing O'Shea, also shot another man named Zodikoff. Of course, the general rule is that upon the trial of a defendant on an indictment charging him with one offense, it is not admissible to introduce proof of another and entirely distinct offense merely for the purpose of prejudicing the jury against the defendant. But where the evidence objected to is pertinent to the main issues in the case, and is in itself competent, relevant, and admissible, it cannot be excluded simply because it happens incidentally to include the commission of another offense, nor where the facts touching the other offense are so intimately connected with facts constituting the offense charged as to make both parts of one transaction, so that there could not well be an intelligent statement of the one which did not allude to the other.

The main features of the case are these: The homicide—that is the killing of O'Shea—occurred about a quarter past six o'clock in the morning of Monday, the twelfth day of December, 1904, in a livery stable on San Pedro Street, in the city of Los Angeles, kept by two men named Bennett and Zodikoff, and known as the "Exchange Livery and Feed Stable." About three days before said December 12th the defendant had sold to Bennett and Zodikoff a horse and wagon. The sale of the property was consummated in front of the livery stable, and defendant drove the horse and wagon into the stable to be delivered to the purchasers. He went with Bennett into the office of the stable to make a bill of sale and receive the purchase money, and took with him a certain halter which he claimed was reserved from the sale, but which Zodikoff claimed to be included in the property sold. After defendant and Bennett concluded their business, defendant discovered that his halter had disappeared, and Bennett told him that Zodikoff had taken it. Defendant was persistent in his demands for the halter and showed anger about the matter. Bennett told him to come the next day and he would tell Zodikoff to give it to him, as it was a small matter. After that defendant made several visits

to the stable to get the halter; sometimes he saw O'Shea, who was employed in the stable as a hostler, and sometimes Zodikoff, both of whom refused to give him the halter, and he had warm words about the matter with both O'Shea and Zodikoff. On Monday morning, about 5:30 o'clock, defendant was seen by a witness looking into the Exchange Stable through a ventilating hole, and when asked what he was doing answered that he was "looking for somebody." About a quarter past six o'clock on the same morning there were in the Exchange Stable the defendant, Zodikoff, O'Shea, and a man named McAfee, who was a witness for the prosecution. Defendant and Zodikoff were near each other, and O'Shea was a little farther toward the rear of the stable, shaking up some straw in one of the horse-stalls. McAfee testified that he heard one voice say, "I come to get the halter," and another voice said, "You don't get it." Then came the reply, "I am a son of a bitch if I don't get it," and another answer, "I am God damned if you do." The witness testified that then "defendant pulled a revolver and fired. He fired at Zodikoff." The bullet struck Zodikoff, who ran past McAfee towards the street. McAfee testified that "then the defendant stepped about three feet in that direction and fired three times toward the back of the stable. I did not see what he was firing at. Immediately before I saw him fire in the rear of the stable three times, I saw him shoot at the man Zodikoff. . . . Immediately after he fired these three shots, I saw a man fall immediately after those three shots were fired." He further testified that "defendant stepped across the body and used a large knife upon it," and the defendant stabbed the knife into the body six times. The witness then went into the street, but returned in about ten minutes and found the dead body of O'Shea "lying in the same place where I saw the defendant plunging the knife into him." In another part of his testimony he stated that "one minute would take the whole time that it took to stand there and watch it all and start to the street." Other witnesses who were in the vicinity, some of them being in another livery stable called the "Ascott," just across the street opposite the Exchange Stable, testified to hearing the shots. One witness said that "it was seemingly no time after I heard the first shot until I heard the others." Other witnesses speak of the time be-

tween the first and second shots as "less than half a minute."
These witnesses testified that immediately after hearing the
first shot Zodikoff came running out into the street crying,
"I am shot! Help!" One of these witnesses, after hearing
the first shot, went to the stable and was there in time to see
defendant plunging the knife into the body of O'Shea. An-
other witness who was in the Ascott stable testified that after
hearing the first shot he saw defendant stab O'Shea. It is
quite clear, therefore, that the shooting of Zodikoff so imme-
diately preceded the shooting and stabbing of O'Shea as to
form part of the same transaction, and it also appears that
the motive for killing both was the same. It is, indeed, diffi-
cult to see how the witnesses could have given an intelligent
statement of the occurrences which resulted in the death
of O'Shea without reference to the shooting of Zodikoff. As
was said in *People* v. *Linares,* 142 Cal. 17, [75 Pac. 308]:
"No matter at what point the narrative had commenced, it in
the end would almost necessarily have reached these connect-
ing facts." Our conclusion is that appellant's objections to
the said evidence touching the shooting of Zodikoff are not
maintainable, and that the court did not err in the ruling
complained of. (See *People* v. *Walters,* 98 Cal. 138, [32
Pac. 864]; *People* v. *Suesser,* 142 Cal. 362, [75 Pac. 1093];
*People* v. *Linares,* 142 Cal. 17, [75 Pac. 308].)

Appellant in his briefs objects to two of the instructions
given to the jury. The first is a mere copy of section 1105
of the Penal Code; and we see nothing in the case at bar which
made the giving of that section improper. The other in-
struction is as follows: "Gentlemen of the jury, there has
been offered and admitted some testimony in this case relating
to the shooting of one Zodikoff at the time it is claimed the
defendant shot Jerry O'Shea. The only relation or object
in considering such testimony was to illustrate or establish
the intent or motive with which the shooting of Jerry O'Shea
was done, if any, and before you can consider the question
of the shooting of said Zodikoff you must be satisfied beyond
a reasonable doubt that the defendant shot said Zodikoff
willfully, unlawfully, and intentionally; and if you have
such reasonable doubt you are instructed to entirely disre-
gard all the testimony you heard on that question." What-
ever grounds of objection this instruction might have pre-

sented to the prosecution, it could in no way have been prejudicial to appellant.

There are no other points calling for notice.

The judgment and order appealed from are affirmed.

Angellotti, J., Shaw, J., Van Dyke, J., Lorigan, J., and Henshaw, J., concurred.