[Crim. No. 1506. First Appellate District, Division Two.—December 21, 1928.]

THE PEOPLE, Respondent, v. CLARENCE A. LEDDY, Appellant.

John O'Gara, E. M. Rea and George T. Kerr for Appellant.

U. S. Webb, Attorney-General, Lionel Browne, Deputy Attorney-General, Fred Thomas, District Attorney, and Frank J. Waterhouse, Assistant District Attorney, for Respondent.

BURROUGHS, J., *pro tem.*—The defendant was accused by an information filed in the superior court of Santa Clara County with the crime of murder. He entered a plea of not guilty and upon a trial of the issue thus raised the jury returned a verdict of guilty of murder of the first degree and fixed his punishment at life imprisonment. He made a motion for a new trial, which was denied. The court thereupon sentenced him to life imprisonment in the state prison at San Quentin. From said order and judgment he appeals.

He contends that the evidence is insufficient to sustain the verdict, and further that the trial court committed prejudicial error in giving certain instructions to the jury, and also in refusing to give certain instructions proposed by him. We will first consider the question of the alleged insufficiency of the evidence to support the verdict.

The transcript of the evidence reveals that two distinct versions of the affray which led to the killing are given by the witnesses. One version being given by the witnesses for the prosecution, and which it is claimed by respondent amply sustains the verdict, and the other by the witnesses for the defendant and from which it is claimed by appellant it was a case of justifiable homicide. Further, even though this theory is untenable, it is claimed that, giving to the testimony of the prosecution its full weight, the offense amounted to no more than voluntary manslaughter. It is uncontradicted that this appellant kept a "bootleg joint" on the Almaden Road, just outside the city limits of San Jose. About 4:30 A. M. on Saturday, May 26, 1928, an automobile arrived at appellant's resort. Robert F. Hill, Jr., Fred Jenny, and Alfred H. Webb were the occupants of the car. An altercation ensued. Webb, Hill, Jenny, appellant, and Fred True, appellant's barkeeper, were participants. Hill was hit on the head with a hoe. Appellant was the man who

hit him. Hill is dead and it is with his death appellant is charged. Bearing in mind the well-settled rule of law that appellate tribunals will not pass upon the credibility of witnesses, or weigh their evidence, the question to determine is this, is there substantial evidence in the record to sustain the verdict of the jury? If so, the verdict may not be disturbed on appeal.

The story of the tragedy, as told by the witnesses for the prosecution, is concisely stated in respondent's brief as follows: "The testimony shows: Alfred H. Webb testifying:

"That Webb, Jenny and Hill arrived at the place of appellant at about 4:30 A. M. on the twenty-sixth day of May, 1928; that Hill and Webb left the car together and started toward the new building; that when they reached the corner of the garage walking side by side, someone *rushed* them. That Webb was thrown to the ground, and Hill was thrown on top of him.

"That Jenny, who had remained in the car, was called while both Webb and Hill were on the ground. That Jenny arrived before Webb and Hill got up; that Hill and Webb got on their feet.

"That thereupon Fred True, the bartender 'came' at Webb with an indoor baseball bat, and appellant was following Hill 'over toward the steps.'

"That Jenny said to appellant 'Put that down or you will kill somebody'; that this was followed by mumbling, and then Jenny said 'Will you promise to throw that away if I let you up.'

"That 'Leddy got up.' While Webb and Hill were brushing off their clothes, Jenny walked back toward the car.

"Webb heard: 'Let's finish the sons of bitches,' and then True came at Webb with the baseball bat again. While Webb was protecting his head by raising his arm, he looked under it and saw Leddy hit Mr. Hill.

"That Leddy hit Hill with a 'long, blunt instrument' resembling People's Exhibit A. That appellant struck Hill on the head. That at the time Webb saw Hill struck on the head by appellant, Hill was lying on the ground.

"The witness Fred Jenny testified:

"That Webb, Jenny and Hill arrived at the place of appellant at about 4:30 A. M. on the morning of May 26, 1928. That he was asleep in the car when it arrived. That

Webb spoke to him upon arrival, asking him to come in the resort, but that he declined to do so and that about three minutes passed when he heard Hill and Webb shout, 'Help, Fred,' and awakening he got out of the car and saw there was a fight, that one man was standing and three were on the ground.

"Leddy was 'on top of the two boys' and True was holding an indoor baseball bat above them, trying to hit someone.

"Jenny said: 'I don't know what this fight is all about or who started this fight. At any rate, you (speaking to True) put the bat away or you will kill somebody.' That he 'got underneath the baseball bat and held True.'

"True said 'they are trying to rob you, and we are helping you,' to which Jenny replied, 'If these boys are trying to rob me, I will take care of myself.'

"Leddy got up, with that statement and started toward the garage. Just a moment or two passed, and Leddy came back to the place where they had struggled. Hill was sitting and Webb was on his knees.

"Leddy 'had a grub hoe,' and Jenny 'met him about half way to where the boys were on the ground.' The struggle for possession of the hoe ended by Jenny and Leddy falling to or hitting the ground. After hitting the ground, it appears Jenny was on top of appellant like 'riding a horse.'

"Jenny remonstrated with Leddy to 'put the hoe down or you will kill somebody.' Leddy stated 'I know when I am licked. . . . I will promise to be good,' whereupon Jenny let appellant up, and Jenny started for his car.

"Reaching his car, Jenny called to Hill and Webb 'Let's get out of here, let's go home. Hill was brushing off his clothes and Webb was leaning on the tree.

"About this time appellant hollered 'Let's finish the sons of bitches, now. With that he made a run for Mr. Hill; and Mr. True made a run for Webb.' On cross-examination Jenny testified he saw appellant run fifteen or twenty feet with the hoe before striking Hill.

"Jenny called to Hill to look out, whereupon Hill raised his hand. Appellant hit Hill three times, the third time after he had fallen to the ground.

"Jenny, by that time, reached and grabbed appellant, saying 'You have killed him.' With that Leddy threw the hoe away.

"Jenny positively identified the hoe (People's Exhibit A).

"Hill never recovered and died the next day.

"J. T. Maguire, a witness for the prosecution, was not a member of the Hill, Webb and Jenny party. He occupied a good position with a public service corporation in California. He was in the place conducted by appellant on the evening of the tragedy. He had had three drinks. He testified he did not see either Webb or Jenny in the place, and that he did not witness any trouble inside the place. That appellant and True left the place together, and that he remained talking with the girl in the place for five or ten minutes thereafter. Seeing no one, he imagined there must be some trouble, and walked toward the door. The first thing he saw was some skirmishing and fist fighting over near the steps. Then, as he said: 'My attention was centered on Mr. Leddy, who had a hoe in his hand and walking toward another gentleman, and he struck this man, I could not say where, but it appeared to me that he struck him on the head. *Twice.*'

"At the time he was struck Hill was backing up and the witness did not see anything in his hands. The witness later stated Hill might have had something in his hands, that he was not testifying *positively* that he did not. Still later, that Hill did not have his hands up.

"After Hill was struck Mr. Maguire left immediately.

"The witness, William Condon, a deputy sheriff, testified to an admission of the appellant that 'Those fellows were never in the joint.'

"To the same effect is the testimony of L. T. Torres, another deputy sheriff.

"Doctor Sullivan, the physician that attended Hill prior to his death and who performed the autopsy, stated that death resulted from a considerable hemorrhage secondary to extensive fracture of the skull. That the cause of the fracture was the application of considerable force."

Contradicting the foregoing we have the following statement of the substance of the evidence given by the defendant and his witnesses as set forth in the appellant's opening brief, which is as favorable to appellant as the evidence will warrant:

"According to the testimony of defendant and his witnesses, Webb knocked at the door of the saloon and was

admitted by Machado. Webb asked True for three drinks of whiskey. True inquired why he wanted three, and was told that he had two friends outside. True refused to give Webb any liquor, saying that he appeared to have sufficient already. Then, Webb appealed to Leddy, who replied that he was not the bartender. Again denied a drink by True, Webb walked out.

"Leddy looked through a small window in the saloon door and saw Hill reaching into the pocket of Jenny, apparently asleep in the parked machine, and a moment later saw Hill with a pocket-book in his hand, evidently taken from Jenny's pocket. Leaving the machine, Hill came toward the door of the saloon, but turned and walked down by the side of the building. Leddy came out of the saloon and catching up with Hill told him not to hide that there. Hill said: 'Who are you?' Leddy replied that he was the boss of the place. At once Hill struck Leddy a blow with his fist. An exchange of blows followed. Hill backed over to the machine, and Leddy spoke to Jenny and asked if the purse was his and Jenny clapped his hand on his breast and said: 'It is mine.'

"Thereupon Hill struck Leddy again, and they clinched. Webb went to the aid of Hill, and the two of them threw Leddy on the ground and piled on top of him.

"At this point Machado heard the uproar and came out from the saloon, bearing in his hand a toy bat which had been hanging above the bar. Machado approached the three fighting men, but took no part except to stand near them with the bat in his hand. While Machado stood there, True, the bartender, also came from the saloon into the yard and went at once to Leddy's aid, seizing Webb and taking him off. Leddy and Hill continued to scuffle.

"Then, Jenny joined in the contest by trying to take the bat away from Machado. Failing to get the bat, Jenny seized a hoe which was lying near, having been left there by a workman the day before. When Jenny came up with the hoe in his hands Leddy turned away from Hill and sought to take the hoe from Jenny. A struggle for possession of the hoe ensued. Finally, Jenny loosened his hold on the hoe in trying to jump and butt Leddy, and Leddy wrenched the hoe from him. Leddy warned Jenny, and Jenny ran out of the yard.

"Thereupon Leddy saw that Hill had joined Webb in an attack on True. Leddy threw the hoe aside, and walking

over engaged with Hill, leaving Webb to fight with True. Hill and Leddy fought with each other, and finally Hill, backing up, seized an ax which was standing in its usual place, near the cellar door of the old residence across the yard from the saloon. Leddy tried to take the ax from Hill, and a struggle for the possession of the ax followed. While they were struggling, Otto, the piano player, ran over and got the hoe and came up with it by the side of Leddy and Hill. Leddy seized the hoe from Otto's hand, and raising it, warned Hill to stand back, but Hill, who now had the ax in his hand, crouched as if he would strike Leddy with it. When Hill disregarded the warning and started toward him Leddy struck Hill twice with the hoe, the first blow upon the shoulder and the second blow on the side of the head. Hill fell, and his head struck the curve. Immediately Leddy put down the hoe and went to Hill's aid, placing him in an easier position, bathing his head and trying to bring him back to consciousness. The fight between True and Webb, which was still going on, came to a sudden stop when Webb said to True: 'Fred, somebody is hurt.' Their efforts to restore Hill failing, Leddy, True and Webb placed Hill in Jenny's car and he was taken to the hospital, where he died the next day.''

There is also evidence that Hill, Webb, and Jenny had visited other resorts that night and had been drinking.

Under this state of the record there can be no question but that the jury believed the account of the affray given by the prosecution witnesses and disbelieved that given for the defense. But it is contended by the defendant that disregarding the theory of self-defense, there is no evidence of any more serious crime than voluntary manslaughter. In support of this view it is said that the parties were engaged in a mutual combat, and that under that doctrine the crime could amount to manslaughter only. He cites Clark and Marshall's Law of Crimes, second edition, pages 358, 359, section 260, where it is said: ''If two persons meet, not intending to quarrel, and angry words suddenly arise, and a conflict springs up, in which blows are given on both sides, without much regard to who is the assailant, it is a mutual combat; and if no unfair advantage is taken at the outset, and the occasion was not sought for the purpose of gratifying malice, and one of them seizes a weapon and strikes a

fatal blow, it is regarded as homicide in the heat of blood, and manslaughter." Other authorities are cited dealing with the law of mutual combat, but as we view the evidence in this case such doctrine is inapplicable. The witness Webb testified that after he and Hill got out of the car, and approached the appellant's saloon, they were suddenly rushed by appellant and True. Webb thereupon called upon Jenny for help and when Jenny arrived the fight was in progress. If the jury believed the story of Webb and Jenny then it was not a case of "mutual combat" as defined by the law-writers and decisions, but was clearly a case of assault by the appellant and his barkeeper, in which Hill, Webb, and Jenny were exercising the right of self-defense and we are at a loss to find any place in the evidence where it appears that it ever became a "mutual combat," which would relieve the appellant from the charge of murder.

What motive may have actuated the appellant and True in attacking Webb and Hill does not appear in the record except by inference, but where men are suddenly viciously attacked, one of the assailants having a small club, it is a natural inference great bodily injury was intended.

The appellant claims that the court should not have given any instructions upon the subject of murder; that the evidence in the case established that the defendant in any event had committed no offense higher than voluntary manslaughter. We have already held that under the evidence adduced at the trial the crime of murder was involved and therefore such conclusion disposes of this objection made by the appellant. The court instructed the jury: "If the unlawful killing is done without the provocation and sudden passion which reduces the offense to manslaughter, or is done in the commission of an unlawful act, the natural consequences of which are dangerous to life, or is committed in the attempt to perpetrate a felony other than those mentioned in the description of murder in the first degree, or the circumstances of the killing show an abandoned heart, this is murder of the second degree, unless the evidence proves the existence in the mind of the slayer of the specific intent to take life. If such specific intent exists at the time of such unlawful killing, the offense committed would, of course, be murder of the first degree." It is claimed that this instruction is erroneous because it tells the jury that if there existed in the mind of appellant a specific intent to take life

it constituted murder of the first degree and that the instruction ignores the necessary elements of premeditation and deliberation which are necessary elements of murder of the first degree. It will be noted that the instruction states that if the unlawful killing is done without the provocation and sudden passion, which reduces the offense to manslaughter, or is done in the commission of an unlawful act, the natural consequences of which are dangerous to life, or is committed in the attempt to perpetrate a felony other than those mentioned in murder of the first degree, or the circumstances of the killing show an abandoned heart, that is murder of the second degree. The court in its other instructions fully defines murder of the first and second degree, and manslaughter, and the elements constituting those offenses. Therefore, read in connection with the other instructions, the instruction complained of constituted a correct statement of the law.

Appellant further contends that the instruction is in conflict with the following one given by the court: "In murder of the second degree there may be a formed design and purpose to kill, but it is followed immediately by the act, and is not deliberated and premeditated." Counsel does not point out wherein this instruction conflicts, but the latter instruction states elements of murder of the second degree and read in conjunction with the other instructions it could not be interpreted as contradictory of the first instruction of which complaint is made.

The court further instructed the jury: "The court also instructs you that upon this trial for murder, the commission of the homicide, that is the killing of Robert F. Hill, Jr., by the defendant, being proved or admitted, the burden of proving circumstances of mitigation or that justify or excuse such killing devolves upon him, the defendant, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." It is contended by appellant that the giving of the foregoing instruction was erroneous, first because the proof on the part of the prosecution did tend to show that the crime committed only amounted to manslaughter; second, because section 1105 of the Penal Code which this instruction attempts to have the jury apply was intended as a direction or guide to the

court to enable the court to determine when the prosecution had made out a *prima facie* case in a murder trial and was never intended to be applied by the jury. In addition to the portion of the instruction above set forth the court annexed to said instruction the following: "But the defendant is only bound under this rule to produce such evidence as will create in the minds of the jury a reasonable doubt of his guilt of the offense charged; it can make no difference whether such reasonable doubt is the result of evidence on the part of the defendant tending to show circumstances of mitigation or that justify or excuse the killing, or from other evidence coming from him or the prosecution." In support of his contention counsel cites the case of the *People* v. *Durand*, 307 Ill. 611 [139 N. E. 78]. In that case the instruction complained of was a copy of section 155 of the criminal code of Illinois and which was similar to section 1105 of the Penal Code of this state. The court said: "This is purely an abstract proposition of law, which gives the jury no correct idea of the law of the case or as to how much proof on the question of self-defense is necessary to entitle the defendant to a verdict of not guilty. The law clearly is that the burden of proof never shifts to the defendant no matter what his defense may be and where the defense is self-defense, it is sufficient if his evidence on self-defense, together with all the other evidence in the case, creates in the minds of the jury a reasonable doubt of his guilt, and there was no instruction given for the people that recognizes this as the law." In the case at bar the jury were fully instructed upon the subject of reasonable doubt and the burden of proof being upon the People. The giving of section 1105 of the Penal Code, has been approved by the supreme court of this state in the cases of *People* v. *McClure*, 148 Cal. 418 [83 Pac. 437], *People* v. *Grill*, 151 Cal. 592 [91 Pac. 515], and in *People* v. *Richards*, 1 Cal. App. 566 [82 Pac. 691]. The objection is therefore not well taken.

The court further instructed the jury that there need be no appreciable length of time between the intention to kill and the act of killing, that they may be as instantaneous as successive thoughts of the mind, it was only necessary that the act of killing be preceded by concurrence of the will, premeditation, and deliberation. The court

gave an additional instruction that a man may do a thing wilfully, deliberately, and intentionally from a moment's reflection as well as after pondering over the subject for a month or for a year. Both of these instructions are couched in appropriate language and are what the trial courts usually term "stock instructions." It is claimed in support of the objection to these particular instructions that the evidence does not justify a reasonable inference that the defendant acted with premeditation, but we have already held that the jury were justified in a verdict of murder of the first degree, therefore this objection is not well taken. It is also claimed that the second instruction is an attempt to state a psychological fact which is exclusively for the jury. Conceding this to be the fact, it was the statement of a mere commmonplace which could not have in any manner prejudiced the rights of the defendant.

Further objection is made to two instructions dealing with the question of intent. The court in said instructions stated that a person is presumed to intend to do that which he voluntarily and wilfully does in fact do, and that in the absence of evidence to the contrary said presumption must prevail. These instructions are also stock instructions and couched in appropriate language. It is claimed that their vice·lies in the fact that the court told the jury that the presumption specified must prevail in the absence of evidence to the contrary without adding that the presumption was subject to being repudiated by evidence. We do not consider said instructions subject to the criticism made. It is expressly stated in the instructions that said presumption must prevail in the absence of evidence to the contrary and in connection with all of the other instructions of the court the jury could not have misunderstood their meaning.

Another instruction given by the court tells the jury that the intent is manifested by the circumstances connected with the homicide. This instruction is attacked upon the ground that the phrase "the circumstances connected with the homicide" implied that the jury should consider the circumstances and nothing else, thereby excluding from their consideration the defendant's testimony as to his intent or intention. But we cannot conceive that the jury as reasonable men could take such an extreme view of this

instruction and particularly when considered with the instructions as a whole.

 Criticism is also directed to the instruction which defines murder of the second degree, it being the claim of appellant that the instruction told the jury that in murder of the second degree both premeditation and deliberation are absent and does not state that if either of these elements is absent the homicide is still murder of the second degree. The instruction as given by the court is in accordance with section 189 of the Penal Code and is correct.

 It is further claimed that the trial court erred in improperly defining the word ''malice'' as the term is used in the law of homicide. The instruction complained of is an amplification of section 188 of the Penal Code defining ''malice.'' The court also in its instructions gave the code definition of ''malice'' as contained in section 188 of said code. As we understand, counsel contends that in this particular case the killing was the result of violent passion engendered in a mutual combat, but as we have already held that the evidence was sufficient to leave the consideration of murder to the jury, the instruction was properly given.

 It is next claimed that the trial court erred in giving an instruction as to what constituted adequate provocation by which an unlawful homicide will be reduced from murder to manslaughter, but we are of the opinion that under the evidence adduced the instruction was properly given.

 It is claimed that the trial court committed prejudicial error in instructing the jury as to the law of self-defense. It is admitted by appellant that the instructions are a correct statement of law, but he claims that they are not applicable to the facts of this case. His argument in support of his objection is practically to the effect that no motive was shown for the killing of Hill by Leddy, but it is unnecessary that the prosecution prove motive where it may be inferred from the evidence. In this case we have the evidence of Webb that he and Jenny were suddenly attacked by the defendant and True and that during the struggle that ensued Hill was killed. From this evidence the jury were entitled to any reasonable inference which the facts might warrant, one of which, as heretofore pointed

out, on an examination of the evidence in this case, might have been the commission of a felony.

It is next contended that in two of the instructions relating to the law of self-defense the court told the jury that in order to justify or excuse the slaying it must have appeared to the defendant as a reasonable man that the killing of the deceased was absolutely necessary. It is claimed that the jury should have been told the legal meaning of the phrase "absolutely necessary" and that failing to explain the phrase the jury were misled. We are of the opinin that the jury as reasonable men would understand that whenever an innocent person is placed in sudden jeopardy of life or limb the absolute necessity referred to in the instructions complained of exists. However, had the appellant desired the matter to be further explained he should have offered such an instruction to the trial court.

It is claimed that during the course of its instructions the court told the jury ten times that the defendant was not entitled to claim self-defense unless the slaying was actually or apparently necessary to save him from loss of life or great bodily injury. It is contended that this repetition had the effect of impressing the minds of the jury with the idea that the court did not believe that the defendant slew deceased under such necessity. A careful reading of the instructions does not impress us as having such an effect. The instructions given stated the law of self-defense in various forms, all of which in our opinion were correct statements of the law and necessitated a repetition of the language complained of. Furthermore, the jury were sworn to determine the facts of the case upon their own judgment and not that of the court's, and the presumption is that they so acted.

It is next claimed that the trial court erred in charging the jury as to matters of fact. The court instructed the jury as follows: "Witness Maguire testified that Hill was backing up and Leddy was following; that he saw no ax in Hill's hands; that he saw Leddy strike Hill twice with the grubbing hoe here in evidence; that Hill fell to the ground. If you find from this evidence, and from all the evidence in the case, that the fatal blow was struck by the defendant when he was not in any real or apparent danger of being killed by Hill or seriously injured in body by him,

the blow was not excusable or justifiable.'' It is claimed that by this instruction the court pointed out to the jury that the testimony of witness Maguire was entitled to full credit and should be accepted by them as correctly presenting the facts upon which the prosecution and defense were in conflict. Section 19 of article VI of the constitution reads as follows: ''Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law.'' An analysis of the instruction given by the court will show that it is not within the prohibition of the section of the constitution just cited. The court states that Maguire testified to certain things and the jury are then told: ''If you find from this evidence and from all the evidence in the case certain facts then the blow was not excusable or justifiable.'' The court does not say that the evidence of Maguire is true nor does he confine the consideration of the jury to that evidence alone. But he says: ''If you find from this evidence and all the evidence in the case, then the defendant is not excusable or justifiable.'' In the case of *People* v. *Casey*, 65 Cal. 260 [3 Pac. 874], the court said: ''Testimony in this case shows.'' In the case of *People* v. *Matthai*, 135 Cal. 446 [67 Pac. 694], the court said: ''The deceased was unarmed.'' In *People* v. *Gordon*, 88 Cal. 422 [26 Pac. 502], the court told the jury: ''The testimony is corroborated.'' In these cases it is clear that the court invaded the province of the jury and did not state the testimony and declare the law, but told the jury that certain facts had been proven. In *People* v. *Richards*, 81 Cal. App. 30 [253 Pac. 162], the court stated the testimony of the defendant on the one hand and that of the prosecuting witness and other witnesses followed by this statement to the jury: ''Now it is for the jury to determine from all the facts whether the defendant committed the act by force or not or by threats of great bodily harm.'' The appellate court held that this was not error, stating that ''it nowhere appears that the court indicated a belief as to the truth or falsity of any witness' testimony, or that the jury should believe the facts to be true as had been testified, or find for or against the defendant if they believed them.'' In the instruction complained of the court does not indicate its own belief as to the testimony of Maguire or any of the other testimony. It follows that the point is not well taken.

In concluding his instructions the court said: "The court submits the case to you expecting you to apply and administer the law given you." The instruction given preceding these words reads as follows: "The law is careful and jealous of the life of a citizen. The law, in effect says: You must not take from your fellowman the life which God has given him; you shall not constitute yourself the judge to declare that a life is forfeited, and execute such judgment, unless there is a necessity, real or apparent, for such action on your part." It is claimed that this instruction told the jury in effect that the defendant constituted himself a judge, declared the life of the deceased forfeited, that is, intentionally took the other man's life. We do not so read this statement. As we understand its meaning, and the only meaning which the jury as reasonable men could have legitimately placed on this instruction as applied to the facts of this case, was that there must be a necessity, real or apparent, to justify the taking of human life, which is a correct statement of the law.

The defendant offered and the court refused an instruction that the defendant is entitled to the presumption of law that he speaks the truth, which instruction also cautioned the jury that they have no right to disregard his testimony merely because he is the defendant, but that his testimony is entitled to the same consideration as that of any other witness. The court gave the jury an instruction that "A witness, whether called by the People, or by the defendant, and the defendant himself, is presumed to speak the truth." We are of the opinion that this instruction covers all that the defendant was entitled to in this behalf.

The appellant also proposed the following instruction: "A person who is upon his own premises where he has a right to be, is not obliged to leave said premises or to flee therefrom in order to avoid an adversary, and in this regard I charge you that a man who is where he has a right to be, is not bound to retreat from any aggressor who there seeks a quarrel with him, but may stand his ground and repel any attack that may be made upon him there, and may meet force with force; and if, as a reasonable able man he believes and has cause to believe that his assailant intends to kill him or do him great bodily harm, he is not

obliged to retreat but may kill his adversary and may even pursue his adversary and kill him if such standing his ground or such pursuit appears to be reasonably necessary in order to protect his life or to protect his body from great bodily injury." The court gave the instruction with the following modification: "But under such circumstances the person assailed, if you should find in the case that Leddy was assailed, must not use more force or violence than is necessary to avoid being killed himself or seriously injured." It is claimed that this modification is incorrect because it omits the element that the defendant had a right to use such force or violence as appeared to him as a reasonable man to be reasonably necessary under the circumstances, a consideration which it is claimed is omitted by the modification. We are of the opinion that the claim is without merit. The court told the jury that if as a reasonable man the defendant believed and had cause to believe that his assailant intended to kill him or do him great bodily harm, he need not retreat but may pursue his assailant if pursuit appears to be reasonably necessary in order to protect his life or limb. The modification is that under such circumstances no more force than necessary may be used to avoid being killed himself or seriously injured. The modification concerns the amount of force which may be used and could not have been otherwise understood by the jury.

▮ The defendant offered and the court refused to give several instructions bearing upon the question of the presumption of innocence and the term "reasonable doubt." The court did give to the jury section 1096 of the Penal Code enacted by the legislature in 1927 (Stats. 1927, p. 1039). It is stated in section 1096a of said code that the instruction given in said section 1096 on the subject of reasonable doubt and presumption of innocence is all that it is necessary that the court should give and we believe is a sufficient answer to defendant's objection.

▮ It is further claimed by appellant that the trial court erred in refusing an instruction offered by him on the duty of individual jurors, to the effect that any juror entertaining a reasonable doubt as to the guilt of the defendant should not vote for a verdict of guilty for the single reason that a majority of the jury are in favor of a verdict of guilty. Among the instructions given by the court appears

an instruction upon this subject in which it is said: "It is your duty as jurors to maintain your individual opinion so long as you think you are right. It is your duty to act in accordance with your honest belief and according to the law and the evidence in the case." We are of the opinion that the foregoing admonition to the jury as given by the court is sufficient and in substance covers the ground of the instruction offered by the defendant.

Complaint is also made that the court erred in refusing to give the following instruction as to defendant's alleged admissions. "There is evidence before you tending to show that the defendant after the homicide and while in the custody of the officers of the law made certain statements with respect to the affray. I instruct you that such statements when made by a defendant under such circumstances are to be received with caution and I further instruct you that you are entitled to take into account the mental attitude of the defendant at the time such statements were made and his condition of responsibility or irresponsibility as you may find his condition from the evidence." This is not a correct statement of the law. The expression "tending to show" trenches on the province of the jury and would be violative of section 19 of article 6 of the constitution. In *People* v. *Casey, supra,* the court condemned the expression of the trial court that the "testimony in the case shows" as being an instruction upon a question of fact. The further expression used in the instruction "under such circumstances" can only refer to statements made by the defendant "while in the custody of the officers of the law," should be received with caution. The instruction not being a proper exposition of the law the court was justified in refusing to give it to the jury.

Appellant also offered an instruction that the jury were entitled to consider and should consider the intoxication or the degree of intoxication of the witnesses or any of the witnesses in the case at the time of the homicide. That intoxication involves a numbness of the faculties so as to affect the capacity to observe, or to recollect, or to communicate, and should be taken into consideration by the jury in determining the weight to be given to the testimony of the witnesses so affected. The vice of the foregoing instruction is that it assumes that the witnesses or some of them

were in fact intoxicated. While there is evidence that some of the witnesses had been drinking, their condition as to sobriety or being drunk was one of the questions of fact involved in the case. The latter part of the instruction undertaking to define the effect of intoxication is a commonplace that needs no exposition and there could have been no injury resulting to the appellant by the court's failure to so instruct the jury. The jury were fully and fairly instructed.

We have gone over the entire record in the case and have considered each one of the points raised by appellant, and we find no prejudicial error.

The judgment and the order denying appellant's motion for a new trial should be affirmed, and it is so ordered.

Nourse, Acting P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on January 5, 1929, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 17, 1929.

All the Justices concurred.