[Crim. No. 2426.   First Dist., Div. Two.   May 13, 1947.]

THE PEOPLE, Respondent, v. WILLIAM C. CRAVENS, Appellant.

Nathan C. Coghlan for Appellant.

Robert W. Kenny and Fred N. Howser, Attorneys General, and Carl W. Wynkoop, Deputy Attorney General, for Respondent.

DOOLING, J.—Appellant was convicted by a jury on two counts charging him with grand theft. The two counts related to two separate transactions with two different persons and for clarity will be separately discussed.

### The Virginia Reame Transaction.

The second count of the information charges the theft from Mrs. Reame of $3,720 on or about November 11, 1944. The evidence shows that Mrs. Reame first met appellant in San Francisco early in January, 1944. She became acquainted with him through correspondence, having obtained his name and former address from her sister who had gotten them from a "Matrimonial Newspaper" and had had some correspondence with him. On the second meeting appellant told Mrs. Reame that "the first time he looked at me he said, 'this is the girl I want to marry.'" On the third or fourth meeting

appellant showed Mrs. Reame a specimen of adhesive gauze and said that he had manufactured it, and that it was a terrible good seller. He told her that he knew everything there was to know about the manufacture of adhesive gauze and that he had started the American Bandage Corporation of Chicago and she understood that he had made $25,000 from that corporation; and he then started the Cra-Tex business in Omaha, Nebraska, manufacturing the same type of bandage and sold his interest in that company for $8,000. The parties rented a building in San Francisco, into a part of which Mrs. Reame moved as her residence and they agreed to go into the business of manufacturing an adhesive gauze bandage as partners, using the remaining portion of the building as their place of business. Mrs. Reame gave appellant smaller sums of money from time to time and on April 4, 1944, she deposited $2,300 in a bank account subject to withdrawal by herself, her son and the appellant. Later additional smaller sums of Mrs. Reame's money were from time to time deposited in this account. Mrs. Reame drew a few checks on this account but the bulk of the money was drawn out by checks signed by appellant. The money was used partly for Mrs. Reame's living expenses and furnishing her living quarters, largely in the purchase of materials for the partnership business and other partnership expenses, and to an amount and in a manner not definitely established for appellant's personal use. Appellant did not succeed in manufacturing a satisfactory gauze bandage and made very few sales in such small amounts that by the end of 1944 the partnership funds were exhausted. Mrs. Reame testified that she invested her money in the partnership in reliance upon appellant's statement that he knew the correct way to manufacture an adhesive bandage.

The witness Stone testified that he, one Burket and appellant organized the American Bandage Corporation in Chicago in 1936; that appellant represented to them that he had a secret formula for manufacturing an adhesive bandage and could manufacture a merchantable bandage; that appellant put no money in the business and in three months' time did not succeed in producing a merchantable bandage; and that, his stock having been placed in escrow to be delivered to him only upon his manufacturing a merchantable adhesive bandage, they discharged him at the end of three months and forfeited his stock in the company. He further testified that

the American Bandage Corporation afterwards manufactured a merchantable adhesive bandage but not according to appellant's formula, and that following appellant's formula it would be impossible to manufacture a merchantable bandage. On cross-examination of appellant evidence was adduced which would support the inference that the Cra-Tex Company, afterwards formed in Omaha to manufacture an adhesive bandage following appellant's formula, had been a financial failure.

Since the amendment of section 484 of the Penal Code in 1927, the former crimes of larceny, embezzlement and obtaining money or property by false pretenses have been consolidated into the single crime of grand theft. (*People v. Myers,* 206 Cal. 480 [275 P. 219]; *People v. Selk,* 46 Cal.App. 2d 140 [115 P.2d 607]; 10 Cal.Jur. 10-Yr.Supp., Theft, § 1, p. 617.) However the elements of the several offenses have not been thereby changed. (*People v. Myers, supra,* 206 Cal. 480; *People v. Selk, supra,* 46 Cal.App.2d 140; 10 Cal. Jur. 10-Yr.Supp., Theft, § 2, p. 618.)

In the crimes of larceny and embezzlement the property must be wrongfully taken from the victim without his consent to the transfer of title to the wrongdoer (15 Cal.Jur., Larceny, § 8, p. 899; 10 Cal.Jur., Embezzlement, § 14, p. 251), whereas the gist of the crime of obtaining money or property by false pretenses is that the victim transferred the title to the property to the wrongdoer under the influence of the false pretenses (12 Cal.Jur., False Pretenses, § 10, p. 457, § 13, pp. 460-461).

Since by opening the joint bank account Mrs. Reame voluntarily placed a title in common to her money in appellant and voluntarily placed it in his power to withdraw the funds therefrom as owner he could not be guilty of embezzlement or larceny. (*People v. Foss,* 7 Cal.2d 669, 670 [62 P.2d 372]; *People v. Hotz,* 85 Cal.App. 450, 452 [259 P. 506]; cases collected in the notes in 17 A.L.R. 982 and 31 L.R.A. N.S. 822; 29 C.J.S., Embezzlement, § 16, p. 693; 36 C.J., Larceny, § 153d, p. 782.) The theft, if one was committed, must therefore have been obtaining money from Mrs. Reame by false pretenses.

In the few cases which we have found on the precise subject it has been held that the procuring of money to be contributed to the capital of a partnership of which the victim is a member cannot constitute the crime of obtaining money by false pretenses because the victim as partner retains

an interest in the fund. (*State* v. *Smalley,* (Mo.) 252 S.W. 443; *State* v. *Woerth,* (Mo.) 256 S.W. 456; *Reg.* v. *Watson,* 7 Cox Cr.Cas. 364.) We are not satisfied that proof that the wrongdoer afterwards converted the partnership property to his own use while the victim was still subject to the influence of his false pretenses would not constitute the crime of obtaining money or property by false pretenses. That it would is suggested by the court in *State* v. *Smalley, supra,* wherein the court in reversing the judgment of conviction remanded the case for a new trial on the theory that the state might prove that "the partnership was used as an artifice or a part of a scheme to defraud and not as a going concern acting in good faith." (252 S.W. 445-446.) We are moved to this conclusion by the consideration that any confidence man could safely operate through the medium of forming a partnership with his victim and then appropriating the assets of the partnership were the rule otherwise. That the wrongdoer gets the property in two steps rather than one where a partnership with his victim is formed should not absolve him of the crime of obtaining money or property by false pretenses where the false pretenses continue to operate up to the moment of his wrongful appropriation of the partnership assets contributed by his victim.

. The difficulty of the prosecution's case on this count lies in the fact that the crime (or crimes), if any, was not complete until the withdrawal and appropriation of the money by appellant. So long as the money remained in the bank account it was subject to Mrs. Reame's power of withdrawal and she was deprived of neither title nor possession. As to those amounts withdrawn from the account for payment of partnership obligations she still retained their partnership interest in the proceeds. No completed crime could occur until appellant withdrew money from the account and appropriated it to his own use. No substantial proof appears in the record of any particular withdrawal and appropriation by appellant. It is not clear that, if guilty of any crime with regard to Mrs. Reame's money, appellant may not have been guilty only of a series of petty thefts, assuming that no single withdrawal and appropriation amounted to $200. (*People* v. *Stanford,* 16 Cal.2d 247, 251 [105 P.2d 969]; *People* v. *Rabe,* 202 Cal. 409, 413 [261 P. 303]; *People* v. *Miles,* 37 Cal.App.2d 373, 378-379 [99 P.2d 551].) The case was tried on the theory that a single crime was committed and there was no clear

proof of any single identified withdrawal and appropriation. For this reason we are convinced that the judgment of conviction on this count (Count 2 of the information) must be reversed.

In the event of a new trial on this count we notice appellant's claim that all of the representations proved were promissory. It may be conceded that a false promise cannot be the basis of a conviction of the crime of false pretenses and that the false representation must be of a present or past fact. (*People* v. *Jackson*, 24 Cal.App.2d 182, 204 [74 P.2d 1085]; *People* v. *Downing*, 14 Cal.App.2d 392, 395 [58 P.2d 657]; *People* v. *Reese*, 136 Cal.App. 657, 663 et seq. [29 P.2d 450]; *People* v. *Walker*, 76 Cal.App. 192, 205 [244 P. 94].) The theory has been advanced in two recent decisions that, as in civil actions for fraud, the making of a promise with no intention of performing it or no bona fide belief in its possibility of performance, is a false representation of a present fact, i. e., of the state of the promisor's mind. (*People* v. *Ames*, 61 Cal.App.2d 522, 531-532 [143 P.2d 92]; *People* v. *Gordon*, 71 Cal.App.2d 606, 624 [163 P.2d 110].) We need not rely on this latter doctrine in the case before us for the reason that the representations by appellant that he knew how to manufacture an adhesive bandage which was merchantable, that he had manufactured a similar bandage successfully for the American Bandage Corporation, and that he had sold his interest in that company for $25,000, that he had successfully operated the Cra-Tex Company in Omaha and had sold his interest in that company for $8,000, were all representations of present or past facts which the jury could have found negatived by the proof.

It is sufficient to prove any single false representation on which the victim relied (12 Cal.Jur., False Pretenses, §19, pp. 469-470; *People* v. *White*, 85 Cal.App. 241, 247 [259 P. 76]; *People* v. *Fraser*, 81 Cal.App. 281 [253 P. 340]), and the fact that false promises were likewise made is not important if there were also false representations of present or past fact which materially contributed to the victim's parting with his property or money. (*People* v. *Bowman*, 24 Cal.App. 781, 794 [142 P. 495]; *People* v. *Ames*, *supra*, 61 Cal.App.2d 522, 532; *People* v. *Gordon*, *supra*, 71 Cal.App.2d 606, 625.)

### The John N. Blair Transaction.

The first count of the information charges the theft from John N. Blair of $2,000 on or about January 13, 1945.

By the end of 1944, Mrs. Reame's money was practically exhausted. Appellant had assembled some crude machinery constructed of secondhand material for the manufacture of an adhesive bandage but had not been able to make it work satisfactorily. He had had some correspondence with the United States Army and had submitted samples of adhesive gauze of his manufacture. He received a letter from a contracting officer of the Army dated August 2, 1944, advising him that the samples submitted were not satisfactory and specifically:

"a. Edges of some bandages are ragged. b. On some of the bandages there are large lumps of pitch-like material adhering to the gauze. c. The individual sections which go to make up the rolls in some instances became detached during unrolling of the bandages. d. Adhesive mass has not been uniformly applied. It is much heavier on some areas than others. Where the adhesive mass is light the adhesive quality appears poor and not equal to that noted on samples of this item tested recently which were manufactured by Nu-Hesive, Inc. (the equal of which is required by specifications). e. Measures approximately 2½" wide. Workmanship should be first class; there should be no lumps present as shown in 'b' above; the sections of the bandage should be neatly attached at the ends by means of the self-adherent quality of the bandage itself; adhesive mass should be uniformly applied; bandage should measure the exact required width. In view of the above, this office does not feel justified to allow you to submit any bids on the furnishing of this type of bandage. If you find that you can improve your bandage to meet the requirements, this office will be pleased to examine such improved bandages."

Mrs. Reame was dissatisfied and was insisting that appellant either produce a merchantable bandage or give her back her money. Against this background appellant ran a business opportunity advertisement in a San Francisco newspaper in January of 1945, which read "something like 'the greatest opportunity on Pacific Coast for a very little money invested.'" Mr. Blair answered this advertisement and met appellant at his place of business on January 12, 1945. At that time appellant told Blair that his business was "medical supply of bandage . . . the kind that nobody else in this Pacific Coast could make, in fact nobody in this country could make but him . . . something like the bandage he cre-

ated back East, called the American Bandage Corporation." At that time appellant told Blair that it would take $2,000 "to put it over."

On January 13, Blair returned and appellant showed him the chemicals that he was using and represented that he was "the only person that know how to manufacture that chemical together for the bandages." He further told Blair that he knew every detail of the manufacture of this type of bandage and how to make it; that he had orders, one order for $5,000 and one for $2,500, just as quick as he could get it turned out. He told Blair about an Army contract which he hoped to get and also told him that nobody else owned an interest in the business. On the first or second meeting appellant showed Blair a small roll of bandage and told Blair that he had made it. He said: "This is the kind of bandage that I am going to make—that we are going to make and supply to the Army, as soon as we get started." He particularly called Blair's attention to the fact that the gauze was cut on the bias. The sample shown Blair was exactly the same as a roll of bandage that Blair later bought in a drugstore and exhibited at the trial, manufactured by Johnson & Johnson. Blair never saw any gauze of that type manufactured in appellant's place of business, "it couldn't be done."

Blair was shown the crude machinery assembled by appellant. He knew that it was worthless but he is a machinist and he didn't worry about that. He told appellant that he could fix the machinery. What Blair was interested in was appellant's ability to make the bandage. On January 13, 1945, Blair paid appellant $500 and received a bill of sale requiring him to pay $1,500 more on or before March 15, 1945. Blair was going to a hospital and after his return he paid appellant the $1,500 by a check which he had received from a brother in Idaho. Blair made an effort to construct new machinery but every time he did so it would be torn down and appellant would say that he had changed the idea. "I just had an idea about a different way of making it." This and appellant's demand for more money discouraged Blair and after a short time he quit the business.

That many of the representations made to Blair were not promissory, but of present or past fact, is clear. We single out the following: The fact that appellant was making or knew how to make a type of bandage that nobody else knew how to make, something like the bandage he created back East called the American Bandage Corporation. That these

statements were false the jury could find from the evidence that appellant had not been able to produce a successful bandage for American Bandage Corporation, and the further fact that many merchantable adhesive gauze bandages were already on the market while appellant himself had not succeeded in manufacturing one of merchantable character. The representation that he was the only person who knew how to manufacture the chemical for the bandage. This was contradicted by the evidence that the chemicals could be purchased ready-prepared from certain manufacturers and that appellant purchased them in that fashion. The exhibition to Blair of a roll of bandage cut on the bias and appellant's statement that he had made it. The evidence shows that the Army required its gauze to be cut on the bias and that appellant had made many attempts to cut the gauze on the bias and had not succeeded.

Since Blair paid his $2,000 for a one-half interest in the business the title to the money immediately vested in appellant with Blair's consent and the crime of obtaining money by false pretenses was thereupon completed. This would be so even if the jury found that appellant had promised to use all or some part of this money in the business. (*Commonwealth* v. *Brown*, 167 Mass. 144 [45 N.E. 1].)

The jury could properly find that the false representations of fact were material inducing causes of Blair's investment. Blair testified that appellant "had a way of talking that he could make me believe anything." "I was interested in the gauze that he could make for the Army" and for the general market. The combination of false representations of fact with promises based thereon is a common form of deception, the purpose and effect of the false statements of fact being to lend credibility to the promises. We have cited cases above to the effect that such combination is immaterial if the false representations of fact are material inducements to the victim's parting with his money or property.

█ Appellant proposed the following instruction which the court refused to give:

"You are instructed that such a false pretense as is involved in a case where it is claimed that property or money was obtained by false pretenses, must be something more than a promise relating to a future event or possibility.

"The mere puffing of the value of what one may have to sell or an exaggeration as to what one may be able to do with a given article, or even a promise to do certain things, however

impossible, is not a false pretense in contemplation of law, and cannot be made the basis for a verdict of guilty in such a case.''

The court did give the following instructions:

''The pretense must be concerning a past or present fact. Mere promises, trade 'puffing,' matters of opinion or prediction are not sufficient.

''You are instructed, if it be claimed that this defendant was guilty on either count of the information of perpetrating a fraud, it is the law by which you are to be guided in this connection that a representation as to what property will be worth at a future date is a mere opinion which does not constitute, in any case, a basis for complaint of fraud.

''You are instructed that if you have a reasonable doubt as to whether the defendant in this case intentionally misrepresented anything relating to the past in connection with the business of making medicated gauze bandages, or intentionally deceived the complaining witnesses as to the present status of the said business, if you have a reasonable doubt as to those questions, you must find him not guilty.''

From these instructions the jury must have understood that they could not find the appellant guilty of obtaining money by false pretenses unless they found that he had made one or more false representations of present or past fact. No prejudice appears from the failure to give the specific instruction proposed by appellant.

■ Appellant's proposed instruction ''that if you have a reasonable doubt as to whether the sums of money in question were taken or received from the complaining witnesses, under a claim of right on his part, you are to resolve the doubt in the defendant's favor, and, accordingly, find him not guilty'' was properly refused. It was erroneous and confusing. It would have amounted to directing a verdict for defendant since there was no doubt that he received the money under a *claim* of right. The very question presented to the jury was whether his claim of right was honest or based on false pretenses.

■ The refusal of the following proposed instruction was not error:

''You are instructed that if after calmly reviewing the evidence you find that you have a reasonable doubt as to whether or not the complaining witnesses in the transactions which occurred between them and the defendant merely made a bad business deal, or believed that they had made a bad

bargain, and that they believed they would for that reason lose their money, you cannot find a verdict of guilty under either count in the information against this defendant.''

The jury was fully instructed on false pretenses and that they could only bring in a verdict of guilty based on false pretenses if they found that false pretenses were made by the defendant, with intent to defraud, and that the false pretenses must be the inducing cause influencing the complaining witness to part with title to his money. Under these instructions the jury could not have convicted if they had a reasonable doubt whether the complaining witness *merely* made a bad business deal.

Evidence was introduced that between the time that Blair paid the first $500 and the balance of $1,500 appellant continued to advertise a one-half interest in his business for sale. Appellant explained that he did this in the belief that Blair might not pay the balance and only with the intention of selling to some other person who might become interested if Blair withdrew from the transaction and received his $500 back. The court refused to give a proposed instruction that ''defendant was entirely within his rights, if he believed or feared that Blair did not intend to complete his contract, but that he would abandon it, in calling to the attention of the public, by advertisement in the newspapers, the fact that he desired to sell a one-half interest in his business.'' The jury must be assumed to be composed of persons of ordinary intelligence and to have known, without instruction, that if the appellant advertised in good faith only for the purpose of hedging against Blair's possible withdrawal from the transaction he was acting within his rights. It is not prejudicial error to refuse to instruct on a truism or matter within the common knowledge of any person of ordinary intelligence. (*People* v. *Roche*, 68 Cal.App.2d 665, 668 [157 P.2d 440]; *People* v. *Leddy*, 95 Cal.App. 659, 680 [273 P. 110]; *People* v. *Edwards*, 72 Cal.App. 102, 121 [236 P. 944]; *People* v. *Scott*, 24 Cal.App. 440, 449 [141 P. 945]; 8 Cal.Jur. 631.)

The judgment of conviction on count one is affirmed. The judgment on count two is reversed and the cause remanded on that count for a new trial.

Nourse, P. J., and Goodell, J., concurred.

Appellant's and respondent's petitions for a rehearing were denied May 28, 1947.