[Crim. No. 3882. Second Dist., Div. Two. Nov. 9, 1945.]

THE PEOPLE, Respondent, v. JAMES M. GORDON, Appellant.

Maurice Gordon for Appellant.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, Fred N. Howser, District Attorney, Jere J. Sullivan and H. L. Arterberry, Deputies District Attorney, for Respondent.

MOORE, P. J.—On March 14, 1944, defendants were indicted in seven counts for grand theft and in one count for criminal conspiracy to commit grand theft by false pretenses and false promises. Their trial commenced on May 15th and the verdict of guilty on all counts was returned on July 12, 1944. Appellant's motion in arrest of judgment and for a new trial having been denied he was sentenced on September 8, 1944, to the state prison at San Quentin for the term prescribed by law. The terms of imprisonment for the counts from 2 to 8 inclusive were to run concurrently and consecutively to the term of imprisonment for count 1.

The appeal is from the judgments of conviction and from the order denying a new trial. It is grounded upon the claims of insufficiency of the indictment; insufficiency of the evidence to prove a conspiracy or to prove grand theft; prejudicial

misconduct of the district attorney; error in admitting evidence of transactions other than those mentioned in the indictment; error in giving and refusing instructions.

## I. The Indictment is Sufficient

Appellant contends that the indictment fails to charge a public offense in two respects: (a) that it does not conform with the provisions of sections 950, 951, 952 of the Penal Code, and (b) that if such sections have been complied with they are unconstitutional in that appellant has been denied due process of law guaranteed by the 14th Amendment of the federal Constitution, and California Constitution, article I, section 13.

The first count of the indictment charges a conspiracy of the defendants in that they "confederated and agreed together and with each other, and with divers other persons to the grand jury unknown, that they would cheat and defraud by criminal means, and obtain money and property by false pretenses and false promises, with fraudulent intent not to perform such promises, and to commit grand theft." Following such charge the indictment sets forth 28 overt acts whereby it is alleged that one or the other or both of the defendants took specified sums of money from the several persons named in the declarations of the overt acts.

Counts 2 to 8 inclusive are in conventional form. Count 2 is typical. By its charging clause it alleges that "on or about March 26, 1941, at and in the County of Los Angeles, State of California, said defendants, James M. Gordon and Harry White did willfully, unlawfully and feloniously take forty-five hundred and sixty dollars ($4,560) in money, lawful money of the United States, of the personal property of one Ida A. Wastlund." Each count specifies the name of the victim and the sum stolen.

 The count charging the conspiracy is not wanting in any of the essentials of a valid accusation. Under our simplified forms of criminal pleading it is not necessary to detail the act which each of the conspirators is to perform in the execution of the enterprise. (*People* v. *Corica,* 55 Cal.App. 2d 130, 135 [130 P.2d 164].) In view of the requirement that the accused must be furnished with a copy of the indictment and with the testimony given before the grand jury the omission from the indictment of the names of the intended victims of the conspiracy is not fatal. The pleading is sufficient if it sets forth in intelligible language a notice of the

offense to be charged. The accused is not entitled to the description of the "particular circumstances thereof" which he may get from his copy of the testimony given before the grand jury or the committing magistrate and furnished to him. (*People* v. *Yant,* 26 Cal.App.2d 725 [80 P.2d 506]; Pen. Code, §§ 870, 925.)

The gist of the crime of conspiracy is the unlawful agreement to commit a crime and an overt act done in furtherance of the agreement. (*People* v. *Black,* 45 Cal.App.2d 87, 96 [113 P.2d 746].) No indictment is insufficient by reason of any defect or imperfection of its form so long as no substantial right of the accused is prejudiced upon the merits of the case. (Pen. Code, § 960.) Section 952, Penal Code, as amended in 1927 provides that it shall be sufficient if its language gives notice to the accused of the offense charged against him. (*People* v. *Gilbert,* 26 Cal.App.2d 1, 7 [78 P.2d 770].) ■ The validity of an indictment cannot be questioned when drawn in ordinary and concise language accusing the defendant of a specific public offense, omitting details, so long as he is furnished with a copy of the accusatory testimony. (*People* v. *Jones,* 61 Cal.App.2d 608 [143 P.2d 726].) The form of the indictment is not important so long as it presents in sufficient substance the facts constituting the crime charged, and it makes no difference whether the indictment be regarded "substantially and actually as a charge of substantive crime or as a charge of conspiracy." (*People* v. *Keyes,* 103 Cal.App. 624, 634 [284 P. 1096].)

■ Neither is the validity of a count charging a conspiracy affected by the fact that the conspirators may have succeeded in committing the crimes which were the object of conspiracy. (*People* v. *Black,* 45 Cal.App.2d 87, 96 [113 P.2d 746]; *People* v. *Chait,* 69 Cal.App.2d 503 [159 P.2d 445].) In no event shall a judgment be reversed because of an error in the form of the indictment "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Pen. Code, § 960; Const., art. VI, § 4½; *People* v. *Curtis,* 36 Cal.App.2d 306, 327 [98 P.2d 228]; *People* v. *Beesly,* 119 Cal.App. 82, 87 [6 P.2d 114, 970]; *People* v. *Pierce,* 14 Cal.2d 639 [96 P.2d 784].)

■ The contention that an indictment drawn pursuant to sections 950 at seq. of the Penal Code as interpreted by the courts of this state is a denial of due process is not

supported by the authorities. ▌ Due process of law means no more than "law in its regular course of administration, according to prescribed forms and in accordance with the general rules for the protection of individual rights." It is complied with so long as provision is made for reasonable notice and opportunity to be heard. (*People* v. *Troche,* 206 Cal. 35, 42 [273 P. 767]; *People* v. *Dunn,* 40 Cal.App.2d 6, 17 [104 P.2d 119].)

## II. The Evidence Is Sufficient To Sustain the Judgments

▌ Counts 2 and 3 accuse the defendants of having feloniously taken from Mrs. Wastlund the sum of $4,560 on March 26, 1941, and $4,650 on April 10, 1941. Counts 4, 5, 6, 7 accuse the defendants of having feloniously taken from Mrs. Chamberlain the sum of $2,559 on May 16, 1941; $1,633 on June 9, 1941; $2,354 on June 20, 1941, and $1,000.50 on June 26, 1941. Count 8 accuses defendants of having feloniously taken from Mrs. Pattengill the sum of $2,633, June 3, 1941. During the course of the trial the evidence with reference to theft from Mrs. Wastlund and the two thefts from Mrs. Chamberlain was limited in its application to the defendant White. That limitation however appears to have been intended to apply only before proof of the conspiracy had been received. Inasmuch as the evidence amply supports the finding of the conspiracy we see no escape for appellant on the ground of insufficient proof from any of the judgments if the evidence received as to the frauds supports the conviction of White.

The variety of grand theft charged is that in which a person by fraudulent representation or pretense defrauds another of his money or property. (Pen. Code, § 484.) The scheme utilized by these defendants whereby to approach their victims was the sale of desert lands in the San Joaquin Valley by representing that they were underlain with petroleum. By testimony of the several purchasers of the desert acres it was proved that the moneys were obtained by making declarations of the value and oil content of the lands, of their proximity to oil production and by promises that the parcels purchased from defendants would be sold or leased to major oil companies within a short time at great profit. The statements of fact were shown to be untrue, and the jury believed that the promises were made without in-

tention of performing them. The testimony introduced to prove the statements and promises falls into two classes, namely, (1) that of the purchasers of the lands and (2) that of defendant White, an accomplice. The testimony of each of the vendees as to the false statements and promises corroborated the testimony of White which the jury accepted.

The seven thefts alleged in counts 2 to 8 inclusive resulted from the fraudulent sales to three women, namely, Mesdames Wastlund, Chamberlain and Pattengill. However, in support of the conspiracy charge 28 overt acts are alleged which include not only the sales to those three women but also the calls made upon and sales to Mesdames Winston and Conger in furtherance of the conspiracy.

According to the testimony of White, defendants commenced their labors together at the time of White's first sale to Mrs. Conger in December, 1940. Prior to White's call on that lady he agreed with Gordon that they would "split" the profits made by the sales to Mrs. Conger and that Gordon would pay White five per cent on the amount of each sale to apply upon White's income tax. Thereupon Gordon told White of the financial condition of each of the prospective purchasers. They continued thereafter to work on this basis in all transactions specified in the indictment. At their first meeting in the presence of each of their vendees defendants posed as strangers to each other; pretended that the land offered was owned by some estate, by some widow in distress, or by some friend who was forced to make sale immediately. Promptly following each sale defendants purchased the parcel from the subdivider for about 20 per cent of its sale price. At the time of making each of the calls they framed their dramatics, line of conversation and method of presentation in such manner as to support each other. As to those 28 acts the testimony of the vendees established that seven calls were made by appellant alone without effecting a sale; that seven calls were made by White alone without sale; that one call was made by both defendants without results; that three calls of appellant alone resulted in sales; that in three calls by defendants together they accomplished sales of the desert land. Of the 28 overt acts six were sales by White; three were sales by Gordon, three were sales in which both were present and participants. Five of the 28 acts were visits by defendants together without accomplishing a sale.

614

*Sales to Mrs. Wastlund*

Mrs. Ida Wastlund, 79 years of age, resided in Long Beach. Prior to her alleged transactions with defendants she conveyed her two Altadena lots worth $2,000 to Gordon in return for 2½ acres of desert land in Kings County.* Between February 19 and May 9, 1941, defendants made 13 calls upon Mrs. Wastlund at her home. They made three separate sales to her, one by both defendants and the other two by White alone. In attempting to sell her 7½ acres on February 3, 1941, Gordon stated that it was better for her to have 10 acres than only 2½; that it was prospective oil land; that 10 acres made a better drilling site and that there was talk of leasing the land at that time. For this parcel she paid him $2,280. When White called on February 19 he sold her 10 acres in Kings County for $2,700 after telling her that she should acquire more land because it was "prospective drilling for oil." He concealed from her the fact that he could on the same day purchase the 10 acres from Murray Blank, the subdivider, at $37.50 an acre. On March 26 White again called on Mrs. Wastlund and sold her 20 acres in Kings County for $4,560 after telling her that it was potential oil land and that it was necessary for her to hold more acreage than she already had. Neither did he then tell her that he could purchase the same 20 acres from Murray Blank for the sum of $800. On April 10 White again visited Mrs. Wastlund and sold her another 20-acre parcel for $4,650 and again did not advise her that he could purchase the same land on that day for $800. In all of her transactions with the defendants singly or together she believed in and relied upon their statements that the land sold her was close to oil production and that she would profit by immediate purchase.

*Sales to the Winstons*

Mrs. Winston testified that Gordon first called at their home in October 1940, and offered to sell them land rich

*The legal descriptions will not be given in the body of the opinion. For reference they are included in this note by omitting the township and range which are always South and East, respectively.

The parcels sold to Mrs. Wastlund were in sections 32-18-19; 16-20-19; 16-21-19; 28-18-19; 7-20-19; 4-19-19.

The parcels sold to the Winstons were in sections 18-21-19; 7-20-19.

The parcels sold to Mrs. Chamberlain were in sections 36-24-20; 16-20-19; 22-19-16; 26-19-16.

The parcels sold to Mrs. Pattengill were in section 26-19-16.

in oil, close to an oil field. He stated that he was in touch with major oil companies and had an offer to lease it within less than 90 days for $40,000. Relying upon appellant's statements Mr. Winston, 83 years of age, purchased 7½ acres in Kings County for $1,500. When Gordon called in November he sold them 15 acres of desert land in Kings County for $4,500 and promised that on his next visit he would bring a check.

Gordon reported to White concerning his sales to the Winstons of 22½ acres for a little over $7,000 and urged White to make a sale of the same amount. When Gordon and White met at the Winston home on January 4, 1941, they pretended to be strangers. White told them of "the Esther Harrington estate" and that he had a splendid opportunity to buy the estate's land. He promised to sell it to a major oil company and on his honor declared that arrangements were already made for the sale and that this property would be leased for a large amount. White sold the Winstons 22½ acres for $4,311, which amount he stated was due by parties who had defaulted on a contract to purchase the parcel. White purchased this 22½ acres from the subdivider, Murray Blank, for $900 in the name of his own secretary, Esther Harrington.

### Sales to Mrs. Chamberlain

Counts 4, 5, 6 and 7 charged thefts from Mrs. Chamberlain, a retired school teacher residing in Long Beach. She had met appellant late in 1940 when he called to inquire concerning a small parcel (1¼ acres) which she owned in the desert. She purchased five acres from him on March 14, 1941, for which she paid $1,305.40 and also conveyed her 1¼ acres. Gordon posed then as the representative of the Associated Acceptance Corporation. Again on March 27, 1941, Gordon sold her another 10 acres in Kings County for $3,000. Neither of the foregoing transactions appears among the overt acts alleged nor constitutes a count in the indictment. In making both sales Gordon represented to Mrs. Chamberlain that the acreage sold her was potential oil land and was a hedge against inflation.

Thereafter White visited Mrs. Chamberlain on May 16. Immediately after White's appearance Gordon entered as White told of some woman who had lost her husband, was in great distress and wished to sell 25 acres; that it was

a potential oil field; that production would not be long delayed; and that when leased she would get a bonus of several hundred dollars per acre. Gordon offered to take 10 acres if Mrs. Chamberlian would take 15. She accepted and paid $2,559 for this parcel. Neither told her that they had already purchased the same 15 acres from Murray Blank for $600.

On June 9, 1941, White again called on Mrs. Chamberlain, and after he had repeated his former representations she purchased 10 acres in Kings County for $1,633. Her grantor was White who purchased the 15 acres for $550 from the Chase Mortgage and Investment Company, the corporation controlled and operated by Murray Blank. On June 20, 1941, Gordon alone sold her another 10 acres in Fresno County for $2,354. He did not disclose to her however that he could and did then purchase the same 10 acres from Murray Blank for $550. Within the week Gordon called again and sold her still another five acres for which he took her remaining "chips and whetstones": two lots in Wilmington, a $1,000 bond of the Morris Essex Railroad Company worth about $200, other securities and $135.50.

In addition to the foregoing sales which are alleged in the indictment, Gordon sold Mrs. Chamberlain 20 acres in Kern County on November 3, 1941. On November 21, 1941, he sold her another five acres in Fresno County for which he accepted an Oklahoma royalty interest and $980. On September 14, 1942, Gordon sold her another 15 acres in Fresno County for $2,260 although Gordon purchased the same acres for $675, which fact he did not disclose to Mrs. Chamberlain.

### Sales to Mrs. Pattengill

Count 8 accused defendants of obtaining from Mrs. Pattengill $2,633 on June 3, 1941. Inasmuch, however, as her other transactions with the defendants throw light upon that incident as well as upon the charge of conspiracy we first hastily review her experiences with them prior to the facts mentioned in Count 8 which is identical with overt act 24.

Mrs. Pattengill was 81 years of age. She had resided in Hollywood about 23 years. She first met defendant White in 1938 and in 1939 he sold her parcels of desert land in the San Joaquin valley. After he had sold her several

tracts White told her that she could have a better drilling section if she would purchase a number of parcels from his other clients. In reliance upon his statements that a lease to a drilling company could be sooner made if she bought other lands she purchased 14 acres in Fresno County in two parcels in October 1939, White's secretary being the grantor in both deeds. When appellant first called upon her on May 1, 1941, to add glamour to his personality and to make a show of responsibility he presented a card giving his address as "Gordon Distributors Company." He stated that it was a family firm; that it dealt in city real estate but that he had been specializing in oil lands in Fresno County; that he belonged to the oil scouts organization and had striven for six months for admission; that he had a document which proved he was an oil scout; that the men whose photographs he exhibited (captains in the oil industry) were also members and that this should satisfy Mrs. Pattengill of his knowledge of oil land. Having gained her confidence by his self-praise and repeated visits, he told her that it would be to her advantage to exchange her lands for some of his because some of her last purchases were remote from the main body of her holdings. Thereupon she purchased 15 acres in Fresno County, paid Gordon $3,250 in money and conveyed to him 10 acres she had purchased from White. He did not disclose to her, however, that he could, and did on the same day, purchase the 15 acres from Murray Blank for $750 but told her that it belonged to a client residing in northern California.

Returning now to the transaction of June 4, 1941, both defendants were present. Appellant told Mrs. Pattengill that it would be much better to have more land because they were asking already for large drilling tracts and he did not think that she "could ever obtain results from the smaller ones"; that it would be very much to her advantage to buy 13 acres from owners of small parcels, 1½ and 2 acres; that the land would be leased for a ⅛ royalty and a bonus of $500 to $750 an acre and asked her to sign a contract appointing him as her agent to make the lease; that he represented five major oil companies. In reliance upon his statements she paid appellant $2,633 for the 13 acres in Fresno County and received two deeds from appellant. On the date of his deeds to Mrs. Pattengill he in turn received a deed from Murray Blank conveying to him the

same 13 acres for which he paid $50 per acre. The latter fact, however, he did not disclose to his vendee.

During the course of her negotiations with defendants White told her many times that the whole proposition was to lease the property for a bonus and a royalty. Mrs. Pattengill was corroborated by her cousin who had lived with her for more than 20 years.

### Other Swindles

Other transactions by appellant for which neither defendant was accused were received as evidence of his criminal intention in committing the thefts alleged as well as of the conspiracy. Prior to his sale to Mrs. Dawson he had called several times. Having learned of the ownership of borax properties by her and Miss Adamson he subsequently returned and stated to them that he could sell no less than five acres as that much was required for a drilling site but would accept their two and a half acres of borax and thereby get their money out; that he would handle the oil lands for them, collect the royalties and make the leases for a commission of 10 per cent. On April 9, 1941, the two ladies purchased five acres in Kings County for which they paid him $1,675. He stated that the land was owned by the Chase Mortgage Company which held a mortgage on the lands and that the owners desired to sell enough to clear the mortgage; that the five acres offered them was the only parcel in the area not under lease to a major oil company; that he would own eight acres adjoining that offered to them. He did not disclose to them that on the same day he would purchase four of the same acres for $150.

May 1, 1941, after many visits to her home appellant sold Mrs. Dawson 5¾ acres in Kern County for $1,800. He told her that it was oil land; that he would lease or sell it for her; that because he was an oil scout he could get first-hand information from the oil companies; that she would double her money right away. He did not tell her this was the same parcel that appellant had sold to Mrs. Conger in 1935 and taken back from her on an exchange in December 1939. She neither sold or leased the land nor received any income from it.

The sale to J. O. Edenbaugh in November 1937 is of the same pattern as those charged in the indictment. He was a retired Santa Monica city employee, formerly driver of

an ash and can truck. Gordon called upon him many times before inducing a sale. He stated that he must sell lands in the Trico area in Kern County prior to the expiration of his option; that it was in an oil district; that the Standard Oil Company was drilling a well just north of the five-acre tract; that if Edenbaugh would purchase this five acres he would guarantee his money back plus 20 per cent in 90 days. Relying upon such statements and promises Edenbaugh made the purchase for $1,000. Gordon then gave him a contract that he would lease the five acres for a 15 per cent commission. Edenbaugh never received any return on his investment, and the land was worthless.

Mr. and Mrs. Leonardo De Lorenzo were visited by appellant many times in 1937. They purchased 10 acres in Fresno County from him in January 1938 for $3,000. In the June following he sold them 40 acres in Kern County for $8,000. He told Mr. and Mrs. De Lorenzo that the 40 acres in Kern County was worth $8,000 and that its value would be doubled before the year had expired; that it was "fine" according to a geologist friend; that he himself had gained inside knowledge because he was manager of the estate and had contact with the escrow. Six months later, relying upon Gordon's statement that it was potential oil land about to be drilled, the De Lorenzos purchased another 20 acres in Fresno County for which they conveyed to appellant a 77-acre ranch with all improvements in Bristol County, New York, worth $5,000, and paid him $600 in cash. During the same year White also sold the De Lorenzos 10 acres of desert land in Fresno County, and in the following month acquired from them 10 of the acres they had purchased from Gordon in the preceding July. After learning from them of their deals with Gordon, White promised to ascertain from a friend in Kern County the worth of their purchase from appellant. White later reported to them that his friend's appraisal was $400 an acre and they would be foolish to exchange it. Thereafter Gordon called at their home with maps of Kern County and told them the area was very rich in oil.

J. F. Reimer was 77 years of age in February, 1942, when appellant told him that he might sell his Oklahoma royalties and buy good land in Fresno County adjoining the lands of the major oil companies; that he himself owned 30 acres and had 80 acres for sale; that he had five acres that had

been seismographed, was oil-bearing and was surrounded by holdings of major oil companies; that five acres in a section to the south of it had sold for $125,000; that if Reimer would purchase the land appellant would look after his interest and take care of it because he knew it was underlain with oil. Reimer paid Gordon $750 for the five acres, and six months later purchased another five acres at $150 an acre after Gordon told him that a major oil company desired it but preferred not to buy from an estate of which this parcel was a part. That he could and did pay Murray Blank $45 per acre for these parcels he did not divulge to Reimer.

Late in 1940 Gordon told Josephine Hunter that his company made investments in nonproductive securities such as hers. On February 18, 1941, she exchanged some stocks for 2½ acres in Kings County. He did not disclose that on the same day he purchased the parcel for $100 from Murray Blank. On April 12, 1941, she exchanged other stocks and paid $580 for 7½ acres in Kings County. To induce this purchase Gordon showed her some statistical data and newspapers giving reports of the explorations of various oil companies in that region. Two days later Gordon purchased the land from Murray Blank for $40 an acre. On May 14 he sold her 15 acres in Fresno County for $5,500. That on the same day he could purchase it from Murray Blank for $750 he did not advise her. April 14, 1943, Gordon sold Mrs. Hunter another 20 acres in Kern County for $4,795 and her 10 acres in Kings County which he had sold her in 1941. He told her this exchange was advantageous and necessary for reasons he had discovered in his own transactions; that the Kern County acres were strategically located and adjoined a large producing area. He exhibited to her news reports that producing wells were on the adjacent lands and had brought in a big supply of oil. Mrs. Hunter never sold or leased any of the land purchased from Gordon or received any returns from it.

The transactions with Mrs. Caroline Conger relate to overt acts 4, 5, 6, 7, 8, 9 and 10 of Count 1. Gordon had gained her confidence and her promise to act only upon his advice. He acquainted White with her name and her ability to invest. They so timed their calls as to meet at her home. Gordon told her that the United Northwest Oil Company had already deposited the price of the land in

the bank and she should accept White's offer. Relying upon such statements she paid them $5,400 for 40 acres in Tulare County. Besides making four other calls upon Mrs. Conger Mr. White sold her 20 acres in Tulare County on December 9, 1940, for $2,700 and on January 4, 1941, he sold her another 20 acres in Tulare County for $3,000. Each parcel sold to Mrs. Conger was conveyed by the same Miss Harrington or by Miss Rideau, maid in the home of White, and each parcel had been purchased or was about to be purchased from Murray Blank at about $35 per acre, which facts were not disclosed to Mrs. Conger. The 20 acres sold to her on January 4, 1941, included 15 acres which defendants had taken from her as part consideration for the 40 acres which she purchased December 9, 1940, but of which she had no knowledge at the time.

### Representations Proved False

The testimony of Harold V. Dodd, deputy state oil and gas supervisor, established that there was no oil or gas in commercial quantities in any of the sections which included the acres sold by defendants to the parties named in the indictment and that there was no oil in commercial quantities in any lands in Tulare County.

Messrs. G. R. Couper of the land and lease division of the Texas Company and Walle Merritt of the land department of Shell Oil Company both gave testimony to the effect that their companies had at times acquired lands within a radius of five miles of the several parcels sold by the defendants for which they had paid only nominal sums for three-year leases; that in no instance was a well drilled upon any of the lands they had leased except in the case of Section 16, Township 20 South, Range 19 East, in Kings County. A "dry hole" was drilled on that section in 1940 to a depth of 10,747 feet. Otherwise their records disclosed no attempt at developing any one of the sections which included the several parcels sold by defendants in the transactions involved. According to these officials neither of the defendants ever transacted any business with their companies. Practically every lease held by those companies in the vicinity, of a five-mile radius of the lands sold by defendants were quit-claimed in 1940, 1941, and 1943. The letters and reports quoted by appellant indicating that the area including the lands sold by defendants "warrants a

thorough test for oil and gas" and "warrants the attention of anyone interested in potential oil and gas land" do not conflict with the testimony of Mr. Dodd.

The testimony of Mr. Ray D. Westcott, Deputy Real Estate Commissioner, proved that the Chase Mortgage and Investment Company had subdivided the lands sold by defendants and. that its president was Murray Blank; that the subdivider of each of the sections from which the parcels were sold declared that "each purchaser will be informed that parcels in this project are being sold as a speculative investment only; that in event that oil or gas in paying quantities is not discovered on this property, the purchaser will probably receive no returns on his investment; will obtain nothing except a lease or a parcel of land." The deputy proved also that a copy of the commissioner's report must be delivered to a purchaser of any parcel in the subdivision before his payment of any part of the purchase price is accepted. In no instance does it appear that a copy of the subdivider's promise or of the commissioner's report was ever given by either defendant to any one of their victims. Thus it appears that while defendants were by writing fully advised of the speculative character of the lands they were selling to inexperienced and aged men and women, their suppression of such writings from their vendees was itself evidence of their deceitful aims.

### Such Acts Condemned as Thefts

Appellant's testimony that he told his customers that an investment in the lands he was selling was speculative was not believed by the jury. From all of the proof submitted they preferred to believe and were warranted in believing that appellant did not divulge the truth under any of the circumstances detailed. The credibility of witnesses, the weight to be given to their testimony and the reasonable inferences to be drawn from all the facts were for the jury, and in the absence of prejudicial error their verdict will not be set aside. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Borrego,* 211 Cal. 759, 765 [297 P. 17]; *People* v. *Pruitt,* 55 Cal.App.2d 272, 275 [130 P.2d 767].) Conflicts in evidence are of no concern to the reviewing court. The jury having accepted the testimony of the witnesses for the People, including defendant White, the testimony of appellant cannot induce us to alter the implied

findings of the jury. (*People* v. *Crownover,* 34 Cal.App.2d 7, 9 [92 P.2d 929].)

In weighing the evidence of the false representations and false promises made by appellant, their materiality and the reliance of the vendees upon them, we have not ignored his arguments to the effect that the promises and representations were mere "predictions and opinions" and are not actionable fraud. The reply thereto is two-fold: (1) The statements of fact were believed by the jury to be false and the promises given were made without intention of performance. Representations that lands are potential oil lands; that major oil companies will lease them and pay bonuses; that the investment will be returned in 90 days with profit; that the investment will be doubled; that the land is adjacent to or near productive oil land—these are material and constitute actionable fraud. (2) The disguise of defendants in dealing with their victims added to their perfidy. They asserted a superior knowledge of the lands and rare opportunities to acquire them not available to others. They pretended that Miss Harrington was a bereft widow or a decedent and that they were thereby enabled to buy lands which the oil producers coveted but deigned not to lease for fear of title complications. Under the circumstances and in view of the chain of events, after defendants' first agreement the vendees were easily induced to believe they were the beneficiaries of two generous and far-seeing benefactors and therefore naturally were influenced by the first representation in making subsequent purchases. (*People* v. *Shaffer,* 38 Cal.App.2d 421, 428 [101 P.2d 560]; *People* v. *Hennessey,* 201 Cal. 568, 582 [258 P. 49].)

### The Vendees Ignorant of the Petroleum Industry

None of the investors was familiar with the oil industry; none had any knowledge of the nature of an oil reservoir —of its dome-like structure, of the manner of its creation and of the numerous strata of sand, rock, clay and ash that must be penetrated before the oil-bearing structure is reached. They had no geological knowledge; knew nothing of the folding or lifting of the earth's crust, of contours, faults and saddles; of the tilted reservoir or of the endless supply of water pressing against, and extending outward from, the lowest contour of the captive petroleum, thus rendering "nonproductive" the surrounding area. Because of their utter

ignorance of these and other technological facts the vendees were readily susceptible to the suggestions of defendants who made use of the popular notion that if a producing oil well is found on section 1 then oil probably underlies the adjacent sections 2, 11 and 12. With this psychological advantage defendants called at the homes of these inexperienced people, pretended to be strangers to each other, pretended to be selling the lands of an estate or of a woman in distress; whereas, in truth, they secretly intended to buy the land from the subdivider after first having obtained the purchase price from her whom they had generously offered to advise, while never disclosing the price to be paid to the subdivider and never favoring her with the certificate exhibited to themselves by the subdivider to the effect that an investment in such lands was a speculation only. Not only did they suppress material facts, which is a fraud (Civ. Code, § 1572), but their very schemes and manner of approach were designed to entrap the unwary and thus were reprehensible and deceptive. (*Brooks* v. *United States*, 146 F. 223, 227 [76 C.C.A. 581]; *Looker* v. *United States*, 240 F. 932, 934 [153 C.C.A. 618].)

The "assurances" and "guarantees" of immediate profitable sales or leases for the vendees were of the nature of promises. If a promise is unconditional and is made without intention of performance it is actionable fraud. A promise is the expression of the present intent which is a fact (*Blakeslee* v. *Wallace*, 45 F.2d 347, 350; *Knickerbocker Merchandising Co.* v. *United States*, 13 F.2d 544, 545); and if the promisor has no intention of performing he deceives those who rely upon his promises. The substantial fraud depends upon the divergence between the act promised and the promisor's belief that he could fulfil his promise. If he knows he intends not to perform, his promise is a fraud. (*Knickerbocker Merchandising Co.* v. *United States, supra.*)

Whether a promise was dishonest is a question for the jury's determination upon all of the evidence. (*People* v. *Ames*, 61 Cal.App.2d 522, 531 [143 P.2d 92].)

If the jury determined that defendants knew or had good reason to believe that the acres they were selling were outside of the productive limits of an oil field or that they had no belief that the land sold was underlain with oil in commercial quantities, or that they were in a far better position to judge than the "unsophisticated public," then they

were warranted in finding that defendants had committed theft by false pretense. (*Van Riper* v. *United States*, 13 F.2d 961, 964.) But fraud founded upon utterance is not confined to mere statements of fact and dishonest promises. Asserting one's belief or opinion in bad faith is equally deceptive (*Keeler* v. *Ley & Co.*, 49 F.2d 872, 874) ; and when the criminal purpose of the accused is demonstrated by numerous acts of taking the money of his victims by means of false promises the jury is not required to be too sensitive to fine distinctions in his favor. (*People* v. *Paluma*, 18 Cal.App. 131, 135 [122 P. 431].)

Numerous authorities are cited in support of appellant's contention that the inducing statements made by him were mere predictions or opinions. (*Tahoe Pines Co.* v. *Newman*, 59 Cal.App. 186 [210 P. 445]; *Zeh* v. *Alameda Community Hotel Corp.*, 122 Cal.App. 366 [10 P.2d 190] ; *Everts* v. *Matteson*, 21 Cal.2d 437, 451 [132 P.2d 476] ; *Wegerer* v. *Jordan*, 10 Cal.App. 362, 364 [101 P. 1066].) Also, he cites the paucity of words used by some of the vendees in their testimony to show that definite promises were not made by defendants. But neither the authorities cited nor the testimony quoted impeach the judgments. Both defendants told Mrs. Conger that the purchase price of the section including the parcel offered her was already in escrow and she would double her money in two months. White pretended to befriend some of the vendees as against Gordon; in other instances Gordon was the confidential adviser of his clients about to be sold by White. Where two clever salesmen, by pretending (1) to be wise concerning the subject of their vending, (2) to give friendly advice, and (3) to afford their customers extraordinary opportunities, gain the confidence of confiding people by dangling before them golden opportunities to gain wealth, proof of explicit statements are not as essential as in transactions between men dealing at arm's length. (*United States* v. *Rowe*, 56 F.2d 747, 749.) The fact that defendants combined false promises of future acts with statements of existing facts with no intention of performance did not overcome the effect of the false pretense concerning the present fact. (*People* v. *Ames, supra.*) But a false promise made by one who knows that he will not perform states his present intent, which is itself a fact. (*Knickerbocker Merchandising Co.* v. *United States, supra.*)

 The opinions of defendants as to the values of the

desert lands were not meaningless. They bore upon existing facts which were inaccessible to the vendees. Values are facts. The importance and materiality of representations of value increase in proportion to the credulity and reliance of those who are asked to rely upon them. (*United States* v. *Rowe, supra.*) These defendants were especially culpable in their opinions of value (1) because of their zealous prophecies of new discoveries, of sales and of leases to major oil companies, (2) because of their pretenses that they were able to sell the lands by reason of the embarrassments of the owners, and (3) because of the vendee's reliance thereon. (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 431 [159 P.2d 958].) Fraud oftentimes consists in asserting pretended beliefs and opinions for the purpose of deceiving. (*Keeler* v. *Ley & Co.*, 49 F.2d 872, 874.) It was for the jury to determine whether under the circumstances the vendees were warranted in relying upon the opinions as to value. (*Willson* v. *Municipal Bond Co.*, 7 Cal.2d 144, 151 [59 P.2d 974]; *Neff* v. *Engler*, 205 Cal. 484 [271 P. 744].) A dishonest opinion expressed to one entitled to rely upon it is actionable deceit. (*Hobart* v. *Hobart Estate Co., supra; Neff* v. *Engler*, 205 Cal. 484 [271 P. 744].) It is false pretense to take the property of another by force of an opinion asserted in bad faith and with a design to mislead. (*Mitchell* v. *Tuttle*, 102 Cal.App. 16, 19 [282 P. 534]; *Keeler* v. *Ley & Co., supra.*) If a seller of land possesses or assumes to possess superior knowledge of the property and asserts it to his vendee who has not had equal opportunity to gain such knowledge, his asserted opinion may be equivalent to an affirmation of fact and therefore actionable fraud. (*Eade* v. *Reich*, 120 Cal.App. 32, 35 [7 P.2d 1043]; *Russell* v. *Roscoe*, 106 Cal.App. 293, 298 [289 P. 185]; *Roloff* v. *Hundeby*, 105 Cal.App. 645, 648 [288 P. 702].) ▬ This leads us to observe that the express testimony of a victim of false pretense that he was induced to part with his money by the fraudulent statements of the accused is not essential. It is sufficient if the inference of his reliance could have been drawn from all the evidence. (*People* v. *Schmidt*, 79 Cal.App. 413, 418 [249 P. 832, 250 P. 1104]; *People* v. *Hong Quin Moon*, 92 Cal. 41 [27 P. 1096].)

### The Conspiracy Was Proved

▬ From the proof recounted and the authorities cited no reasonable doubt remains of appellant's guilt of the seven

acts of grand theft. Although the testimony of the vendees as to counts 2, 3, 4, and 5 was at first limited to White only, it is reasonable to infer that the trial court considered that limitation removed after the testimony of White who revealed the agreements and close collaboration between himself and appellant in their successful attempts to obtain money by false pretense. Inasmuch as the existence of the conspiracy made both guilty of any act done in furtherance thereof (*People* v. *Temple,* 15 Cal.App.2d 336, 339 [59 P.2d 417]), any doubt remaining as to appellant's participation in the crimes charged in the last mentioned counts was dissipated by the conclusion of the jury that the conspiracy had been established.

So interrelated and harmonious were the operations of defendants as disclosed by the documents and the testimony of the vendees that, based solely upon them, honest deduction could not but reasonably have inferred their conscious collaboration with a definite purpose. In fact, so marked with perfidy was their behavior that no strain of conscience was requisite to an inference of the existence of a conscious criminal accord to conduct a campaign of wilful plunder. Their bold efforts to beguile the innocent rendered the latter impotent as against the artifices of trained minds and aggressive personalities. The conspirators were so resolved to break all sales resistance that no peace was allowed an investor until all of his savings had been taken away. Indeed, were they so constant of purpose that a sinister and malign influence fringes the border of every scene.

Appellant contends that the inferences to be drawn from the fact that he sold lands in the same theater and to the same purchasers are not sufficient to support a conviction for conspiracy. But the jury were not required to rest upon inference from the narratives of the vendees, the deeds and contracts of sale to derive a finding of the conspiracy. While circumstantial evidence may, and usually does, suffice to prove a conspiracy, the verdicts here were not required to rely for support upon indirect proof.

Defendant White testified fully and freely of his agreement with appellant to divide the profits realized from Mrs. Conger's purchase if Gordon should recommend the sale. He related the details of the events of their united efforts in making sales to each of the vendees; of their pretending at first to be strangers; of their division of the profits gained

in each instance; of his receipt from Gordon of an additional five per cent of the sales' prices to provide for the excess of his income tax; of Gordon's supplying him with names of prospective investors. They drew their arguments and suggestions from a common reservoir. They made substantially the same representations as to the ownership, as to the proximity of the acres to oil production, as to the certainty of its productivity and of its prospective sale or lease for a huge sum.

A criminal conspiracy may be proved by the testimony of a conspirator as well as by the conduct of the defendants and the circumstances of their dealings. (*People* v. *Malone,* 20 Cal.App.2d 1, 6 [66 P.2d 216]; *People* v. *Zimmerman,* 3 Cal.App. 84 [84 P. 446].) Conspiracy is a distinct offense of which the parties may be guilty even though they have been convicted of the substantive crime. (*People* v. *Martin,* 114 Cal.App. 392, 396 [300 P. 130].) The purpose of evidence in a conspiracy case is to establish an illicit concord of the participants (*People* v. *Stevens,* 78 Cal. App. 395, 408 [248 P. 696]), and the conspiracy is established when it is shown that the defendants entertained a mutual design to commit the offense designated as the aim of the conspirators, followed by an overt act in pursuance of such design. The secret agreement of defendants having been proved by White and the numerous overt acts in furtherance of their conspiracy having been attested by the victims of their unlawful scheme, the verdict has substantial support. (*People* v. *George,* 74 Cal.App. 440, 452 [241 P. 97].)

While the consummation of the conspiracy is not necessary to a conviction therefor (*People* v. *Gilbert,* 26 Cal.App. 2d 1, 21 [78 P.2d 770]), the facts impliedly found furnish proof of criminal acts in achieving the criminal purposes. The evidence received being competent the verdict cannot be reversed unless it be shown that upon no hypothesis was the evidence sufficient to support the judgment. (*People* v. *Yant,* 26 Cal.App.2d 725, 737 [80 P.2d 506].) While to sustain a conviction for conspiracy it is not essential that the overt act be criminal (*People* v. *Corica,* 55 Cal.App.2d 130 [130 P.2d 164]), yet 13 of the 28 overt acts alleged were shown to have been seasoned by false statements and promises and by suppressing material facts from the vendees which if known would have defeated the sales.

Appellant urges that ''in the absence of proof of the existence of a conspiracy'' all the acts and statements

of defendants occurring more than three years prior to the return of the indictment (March 14, 1944) would not be proof of a conspiracy within that period. Such is not the law. It is no valid objection to evidence which tends to show the successive steps in the formation of a conspiracy of those accused merely that the facts disclosed had their genesis at a time long anterior to the agreement. It is admissible if the evidence tends to prove the criminal accord. (*People* v. *Stevens, supra.*) However, proof of the commission of 14 of the overt acts within the three-year period blasts appellant's contention. Proof of one overt act is sufficient to support a conviction for conspiracy. (Pen. Code, § 1104.) The erstwhile existence of a criminal conspiracy may be proved by one of the conspirators. (*People* v. *Earl,* 10 Cal.App.2d 163, 165 [51 P.2d 147].) Once the conspiracy is established all evidence of the substantive crimes becomes admissible against all participants. (*People* v. *Temple, supra.*) It thereupon devolved upon the jury to determine the issue as to whether a conspiracy existed and whether the overt acts occurred. (*People* v. *Talbott,* 65 Cal.App.2d 654, 663 [151 P.2d 317].)

Conviction of appellant for the thefts charged does not relieve him of guilt in entering into the conspiracy. (Pen. Code, § 182; *People* v. *Martin,* 114 Cal.App. 392, 396 [300 P. 130]; *People* v. *Clement,* 97 Cal.App. 238 [275 P. 511]; *People* v. *Yant,* 26 Cal.App.2d 725, 731 [80 P.2d 506].) It is true that the evidence does not show that all of the fraudulent acts were within three years from the return date of the indictment, but such showing is not essential to the competency of the evidence. A conspiracy may be proved by evidence of its gradual formation, of acts which occurred long anterior to the criminal compact. (*People* v. *Black,* 45 Cal.App.2d 87 [113 P.2d 746].) Therefore the sales to Conger, Wastlund and the Winstons more than three years prior to the indictment were evidence of the conspiracy.

### *White Was a Competent Witness*

Appellant contends that this court should disregard White's testimony because it was given under promise to be lenient if he testified truthfully. We are in accord with the doctrine that the testimony of an accomplice who has confessed his guilt of numerous crimes must be regarded with suspicion, especially where he has been encouraged to expect immunity or only slight punishment for the crime

under investigation. (*People* v. *Walther,* 27 Cal.App.2d 583, 590 [81 P.2d 452]; *People* v. *Coffey,* 161 Cal. 433, 489 [119 P. 901, 39 L.R.A.N.S. 704].) But that principle does not require an inhibition against the admission and consideration of the testimony of such accomplice. His testimony is received with all of its vices as in the case of any witness. If he is believed his testimony makes proof; if he is wholly discredited it does not affect the accused. If his criminal record is dark enough to raise a reasonable doubt the jury acquits; if in spite of it he is believed, a verdict of conviction follows. But a reasonable doubt created in the minds of the reviewing court is not a factor. (*People* v. *Bargala,* 81 Cal.App. 381, 386 [253 P. 938].) If testimony is not inherently incredible it will support the verdict. (*People* v. *Pruitt,* 55 Cal.App.2d 272 [130 P.2d 767].) However, the jury in this case had much evidence in the testimony of the vendees to support the detailed narrative of White.

Inasmuch as upon no hypothesis whatever is the evidence insufficient to support the verdict and the decision of the trial court, the judgments cannot be reversed for want of proof. (Const., Art. VI, § 4½; *People* v. *Newland, supra.*)

III. No PREJUDICIAL MISCONDUCT OF THE DISTRICT ATTORNEY

 The offer by the district attorney of evidence of the cost of the lands sold and his comment to the jury thereon are assigned as prejudicial misconduct. It was contended at the trial that such evidence would prejudice the jury and that there were no misrepresentations concerning cost. In a prosecution for false pretense the suppression of a fact material to the transaction is proper subject of proof. While proving that defendants sold Mrs. Winston desert land at $300 an acre its cost to them on the same day of less than $50 an acre was competent (1) to show the bad faith in advising the investment and in representing that it was potential oil land and that they had an offer to lease it within three months for $40,000; (2) also it was competent to prove that while selling desert land as oil land defendants stealthily suppressed from the vendee a material fact, namely, the price to be paid the subdivider. Such fact would have caused the vendee to suspect, if not to be convinced, that the land was not worth the price at which defendants offered it. Such evidence was especially pertinent as proof of the conspiracy to cheat and swindle the victims named. The suppression of a material fact by

a person who states other facts calculated to mislead is actionable fraud. (Civ. Code, §§ 1572, 1710; *Wells* v. *Zenz,* 83 Cal.App. 137, 140 [256 P. 484]; *People* v. *Simmons,* 12 Cal.App.2d 329, 332 [55 P.2d 297]; *United States* v. *Rowe,* 56 F.2d 747, 749.)

No prejudice resulted to appellant from the argument of the prosecutor in which he told the jury of the prices of $35 and $40 an acre paid by defendants for the lands they had sold at $150 and more per acre. Such facts being in evidence were proper subject for discussion by counsel, and consideration by the jury. (*People* v. *Sieber,* 201 Cal. 341, 355 [257 P. 64]; *People* v. *Molina,* 126 Cal. 505, 508 [59 P. 34].)

Appellant argues that prejudice resulted to him when the deputy district attorney told the jury in the opening statement the actual cost of the lands to defendants on the same day of their sales to the several vendees. To yield to such argument would be contrary to the traditional practice in this state. It is not only proper but beneficial for the prosecutor at the outset to outline the evidence he purposes to introduce in support of an accusation. It is not evidence and has no binding force. And if it had such force it is presumed to have been dispelled by the instruction to consider as evidence only that which had been received as evidence. (*People* v. *Stoll,* 143 Cal. 689 [77 P. 818]; *People* v. *Pantages,* 212 Cal. 237, 244 [297 P. 890].) Even though the prosecutor's outline of evidence in his opening statement should not be followed by actual proof, yet no prejudice results in the absence of a showing of bad faith. (*People* v. *Wong Hing,* 176 Cal. 699 [169 P. 357]; *People* v. *Donaldson,* 36 Cal.App. 63 [171 P. 442].) The record here fails to disclose any instance of the failure to present the testimony of living witnesses in support of the opening statement. However, any such failure would have been cured by the jury's obedience to the instruction to be guided by the evidence received. (*People* v. *David,* 12 Cal.2d 639 [86 P.2d 811].)

### IV. NO ERROR IN ADMITTING EVIDENCE OF SIMILAR TRANSACTIONS

Complaint is made of the trial court's receiving evidence of transactions with others similar to those had with the vendees named in the indictment. Specifying the sales to Edenbaugh in 1937, to Mrs. De Lorenzo in 1938, to Mrs.

Dawson and Mrs. Hunter in 1941 and 1943 and to Mr. Reimer in 1942, appellant argues that these transactions "had no bearing upon . . . either the conspiracy count or any of the grand theft counts"; that they were "to insure a prejudice against appellant." In support of this contention many authorities are cited (*People* v. *Albertson*, 23 Cal.2d 550, 576 [145 P.2d 7]; *People* v. *Gibson*, 107 Cal. App. 76 [289 P. 937]; *People* v. *Gaertner*, 43 Cal.App.2d 388, 395 [110 P.2d 1002]; *People* v. *Glass*, 158 Cal. 650, 655 [112 P. 281]; *People* v. *Darby*, 64 Cal.App.2d 25 [148 P.2d 28]). These cases are either contrary to appellant's contention or they do not support it because they are distinguishable. The guiding rule in a situation like the one before us is that evidence of similar transactions is admissible to show guilty knowledge or intent so long as they "contain the material elements of the main case." (*People* v. *Robinson*, 107 Cal.App. 211, 224 [290 P. 470]; *People* v. *Bird*, 124 Cal. 32 [56 P. 639].) It is also competent to prove a definite prior design which included the doing of the act for which the accused is on trial. Under this rule evidence was admissible to show that defendants had made substantially the same representations to other persons. (*People* v. *Robinson, supra.*) Such or similar representations to other victims of their cunning are properly received also to show guilty knowledge of the accused in making the false pretenses to the vendees named in the accusation, to establish a plan and scheme to defraud (*People* v. *Whiteside*, 58 Cal.App. 33, 38 [208 P. 132]), and to prove defendants' knowledge of their falsity or a criminal intent. (16 C.J. § 1162. See *People* v. *Wymer*, 53 Cal.App. 204, 206 [199 P. 815].)

So constant is the pattern of appellant's behavior in all of his sales of desert lands, demanding exorbitant profits on his own investment, from old or inexperienced people; dealing in worthless lands in the general area of an oil field; suggesting a dramatic situation whereby the lands became available for purchase; pretending to have knowledge that the acres offered would be sought by the major oil companies at extravagant prices while at the very time he knew that much of the same or adjoining property had been held by those operators under inexpensive leases and quit-claimed prior to his campaign to sell them to the unwary —so uniform was his conduct on every theater of his operations that no reasonable doubt remains of the felonious

purpose that activated his deeds. But if there were serious doubt as to the correctness of the court's rulings in allowing proof of transactions with the vendees not named in the indictment, still they would not constitute prejudicial error under section 4½, article VI of the Constitution for the reason that from a review of the evidence the guilt of appellant is clearly established.

The effort of appellant to muddy the stream by injecting the false issue of his creed was abortive below and is ineffective here. Not a word was said by the prosecuting attorney to imply that appellant ever attended a church, a synagogue or a Moslem temple. The only mention in the record of appellant's attachment to any group of worshipers was the response to his own cross-examination of Mrs. Chamberlain which he followed with an offer of a letter addressed to himself and written by that lady at appellant's own request. If the jury were impressed as we are they must have concluded that every phase of that document was composed by appellant in his zeal to forestall a prosecution by a method as devious as those used in selling worthless acres on the margin of the Diablo Range.

### No Error in Giving or Refusing Instructions

Appellant assigns as error the rejection of his offered instructions 17, 32, 33 and 47 to the effect (1) that the jury must adopt that interpretation of two susceptible constructions of the evidence that will admit of defendant's innocence, and (2) that two classes of evidence are recognized and of what each consists. The answer is that the principles embodied in the refused instructions were contained in the court's instructions 21 and 22. Such repetition would have been undue emphasis. After the trial judge has once given an applicable principle of law he is not obliged to repeat it nothwithstanding it may be dressed in forceful verbiage and garnished with exhilarating phraseology. (*People* v. *Bickerstaff*, 46 Cal.App. 764, 775 [190 P. 656]; *People* v. *Wolfgang*, 192 Cal. 754, 763 [221 P. 907].) It is contended that the doctrine of *People* v. *Hatchett*, 63 Cal.App. 2d 144 [146 P.2d 469] and *People* v. *Rayol*, 65 Cal.App.2d 462 [150 P.2d 812] should control because "the evidence of a conspiracy is wholly of a circumstantial nature." So contending, appellant overlooks the fact that one of the conspirators testified as to the progressive steps of the con-

spiracy from its incipiency to the attainment of its final objective.

Appellant also contends that error was committed by omitting from the instructions on conspiracy that the jury "must find the commission of an overt act within three years from the date of return of the indictment." The answer to such contention is that no request was made for an instruction to the effect that the overt act must have been committed within three years prior to the filing of the indictment. It is a rule of early origin and of long continued practice, with the exception of certain situations not here involved, that if counsel for the accused deems necessary an instruction upon any issue or upon any feature of an issue or of the controversy it is his duty to request the trial court to give such instruction as he may desire. (*People* v. *Matthew,* 194 Cal. 273, 283 [228 P. 424] ; *People* v. *Rogers,* 163 Cal. 476, 484 [126 P. 143] ; *People* v. *Winthrop,* 118 Cal. 85, 91 [50 P. 390] ; *People* v. *Ahern,* 93 Cal. 518 [29 P. 49] ; *People* v. *Ellison,* 26 Cal.App.2d 496 [79 P.2d 732] ; *People* v. *Martin,* 44 Cal.App. 45, 46 [185 P. 1003].)

It is true that the language of section 1127, Penal Code, prior to 1935 provided that "In charging the jury the court must state to them all matters of law necessary for their information." That language was construed under some situations to require the court's charge without reference to requests of counsel. But by the amendment of that section the court *"may* instruct" etc., and "Either party *may* present . . . any written charge on the law . . . and request that it be given." (Italics added.) Section 1093 goes no further than that "the judge *may* then charge the jury, and must . . . if requested by either party," on pertinent points of law. In the absence of any constitutional requirement (Const. Art. VI, § 19) the statutes govern. The analogue of appellant's contention was urged in *People* v. *Simeone,* 26 Cal.2d 795, 808 [161 P.2d 369], in which the court held that the defendant having failed to request an instruction could not thereafter complain. It follows that upon such assignment appellant is without support.

Instruction 59 having been offered by appellant was modified by inserting the italicized words which made it read in part as follows: "The court therefore instructs you that the price at which these parcels of land were sold by either of the defendants cannot and must not *of itself and apart from*

*other circumstances in evidence be considered by you as evidence* of fraud even though you may personally feel that the selling price was disproportionate or excessively high." He now contends that error was thereby committed in that the modification nullified the instruction. We are blind to any such effect. It would not have been proper to instruct that defendants' sale price "cannot and must not be considered" as evidence of fraud. Standing alone the price of land cannot be deemed evidence of fraud, whereas in connection with other facts it may constitute the virus of such proof.

 Two instructions, 37 and 38, offered by appellant, bearing upon (1) sales of land at excessive prices and (2) the right of one to sell land he does not own if he subsequently acquires title, were read to the jury. He now criticizes these instructions as "inconsistent with the statement of the trial judge that the jury will consider the cost price," proof of which was admitted. This contention is unavailing in the light of the court's admonitions that from the rulings made during the course of the trial the jury was "not to infer" the opinions of the court "as to the guilt or innocence of the accused"; that "the jury are the sole and exclusive judges of the facts." However, if there might have been an inconsistency between the instructions and the court's rulings it was invented and imported by appellant, who may not complain of his own misconceptions of procedure. (*People* v. *Curtis*, 36 Cal.App.2d 306, 321 [98 P.2d 228].)

 Appellant assigns as prejudicial instruction 46 which announces that theft may be committed by larceny, embezzlement, or by false pretense or representations (Pen. Code, § 484), and instruction 60 which says in effect that the crime of theft is committed if one is induced to part with his property by reason of material false pretenses as to a past or existing fact. The jury could not have been misled by being told that grand theft includes larceny and embezzlement as well as false pretense. (*People* v. *Woolsey*, 13 Cal.App.2d 54, 58 [56 P.2d 557].) The indictment alleged only false pretense, and all of the evidence offered established that the offense came within the category of that crime.

 Instruction 52 advised the jury that while the expression of opinion will not constitute a false representation yet if a false representation extends "beyond mere opinion concerning the quality, value, nature or other incident of an article or property offered for sale or of the solvency of one of

the contracting parties to a contract . . . whereby the purchaser . . . is defrauded'' it is a violation of law. This instruction is attacked on the ground that there was no testimony of false representations concerning the quality, value or nature of the land sold. From the facts impliedly found and above discussed no reasonable doubt remains that the defendants by their statements and suggestions induced their customers to believe that they were paying their money for acres so near production that they must overlie oil-bearing structure. While it is true that the solvency of defendants was not discussed in positive terms to their victims, yet their repeated offers to purchase or their statements of what lands they had purchased were implications that they were men of bounteous resources. But if such statements may not be deemed representations appellant could not have been prejudiced. The jury were clearly instructed to be governed by the evidence only. Assuming that they were of ordinary intelligence they must have derived their verdict with full realization of their obligations to the state. (4 Cal.Jur. 1943 Rev., § 574, p. 958, 959.)

In view of the foregoing it is needless to labor this discussion with comments upon the asserted errors (1) in denying appellant's motion peremptorily to instruct the jury to acquit or (2) in denying his motion for a new trial. (*People* v. *Clark,* 61 Cal.App. 46, 47 [214 P. 248] ; *People* v. *Kimball,* 23 Cal. App.2d 32, 34 [72 P.2d 157].)

The judgments of conviction and the order denying appellant's motion for a new trial are affirmed.

McComb, J., and Wilson, J., concurred.

A petition for a rehearing was denied November 20, 1945, and appellant's petition for a hearing by the Supreme Court was denied December 6, 1945. Carter, J., and Schauer, J., voted for a hearing.